MORGAN v. UNITED STATES.

Where the owners of a vessel let her to the government in time of war,—they officering and manning her and agreeing to keep her in repair, and fit for the service in which she was engaged—and they to take the marine risks, but the government the war risks—*Held*, that a stranding of the vessel incurred by her attempt to cross a bar, in charge of a government pilot, upon an order of the quartermaster of the government when the wind was high and the water low—the quartermaster having seen the vessel strike on a previous attempt to cross, and he giving the present, a second, order with a full knowledge of the danger of crossing, and

against the judgment of both the master and pilot, because the exigencies of the service in his judgment required the attempt to be made—was to be regarded as a marine risk and not a war risk, and that the owners and not the government should bear the loss.

APPEAL from the Court of Claims; the case being thus:

Morgan let, on the 1st of March, 1865, a vessel to the United States by a charter-party, by whose terms the owners were to keep the vessel tight, stanch, manned, victualled, and apparelled, and fit for merchant service; and the United States were to pay $182.25 *per diem.*

The United States were to employ the vessel and pay the *per diem* "until the vessel is returned to the said Morgan, in Philadelphia, in the same order as when received, ordinary wear and tear, damage by the elements, collision at sea or in port, bursting of boilers, and breakage of machinery excepted." The charter was to continue in use as long as the War Department required the vessel. The owners were to bear the marine risk, the United States the war risk.

Under the charter-party the vessel was, in July, 1865, at Brazos St. Iago, Texas, and was, by the quartermaster there, ordered to receive on board certain troops and stores, and to proceed as soon as this was done to New Orleans, Louisiana.

The bar at the mouth of the harbor of Brazos is difficult and dangerous, and when the vessel was ready to proceed on the voyage the wind was high and the water on the bar low. The quartermaster, being informed of the difficulty, ordered a tugboat to aid in taking the vessel over the bar, and in tow of this tugboat and in charge of a pilot in the service of the United States the vessel proceeded to the bar and attempted to cross, but struck, and the hawser of the tow having parted, the vessel swung round inside the bar and returned to the landing. In this attempt she received injuries which, if time could have been allowed, could have been repaired in two days, and at a cost of $500 or $600.

The quartermaster again ordered the vessel to proceed to sea. This order was given with a full knowledge of the

danger of crossing the bar, and against the judgment of both the master of the vessel and the pilot; but the *exigencies of the service*, in the judgment of the quartermaster, required the attempt to be made.

The master, under this order of the quartermaster, again attempted to cross the bar in tow of the steamtug, and under charge of the government pilot, as before, but struck heavily and was finally dragged over the bar by the tug, aided by her own steam-power. In this attempt she sustained such damage that she was compelled to use her steam-pump to save her from sinking, and the troops and stores being discharged, she was towed to New Orleans by a government transport.

The repair of the damages so sustained in crossing the bar cost $6890, of which the government paid $4283, and refused to pay any further part thereof.

The said vessel was laid up and detained in making the said repairs in all forty-five and a half days, for which time the *per diem* allowance stipulated in the charter-party at $182.25, amounted to $8292.37, of which the government paid $2281.06, as wages and board of the master and crew who were employed in aiding in the repairs of the vessel; And refused to pay any further amount on account of the said *per diem*. Thereupon Morgan filed a petition in the Court of Claims for the whole amount claimed and unpaid. That court dismissed the petition.

*Messrs. N. Chipman, Carlisle, and McPherson, for the claimants:*

The injury was caused by a war risk; the imminent danger of the country at that moment and the urgent necessity of sending troops forward to New Orleans without delay. The quartermaster had "a full knowledge of the danger of crossing the bar." He knew he was going into the jaws of destruction; but "the exigencies of the service"—those same exigencies which compel men to walk up to the cannon's mouth—compelled him to give the desperate order. The order was obeyed and the catastrophe followed. What was

all this but the risks of war, "war risks?"    Such risks the United States were to bear.

*Mr. C. H. Hill, Assistant Attorney-General, contra.*

Mr. Justice DAVIS delivered the opinion of the court.

These claimants cannot recover, on the ground that the injuries to their vessel were occasioned by the tortious act of the quartermaster at Brazos in compelling their master, against his better judgment, to proceed to sea; nor would their condition be improved if the vessel had been actually impressed into the service of the United States, for in neither case would the Court of Claims have jurisdiction.*    Congress has wisely reserved to itself the right to give or withhold relief where the claim is founded on the wrongful proceedings of an officer of the government.

The case, therefore, rests wholly on the contract of affreightment, and the inquiry is, which of the parties to it must bear the loss caused by the stranding of the claimants' vessel on the bar at the mouth of the harbor of Brazos.

The stipulations in the contract applicable to this subject leave no room for doubt how the question should be answered.    The United States, being in a state of war, found it necessary to hire the injured vessel for the purpose of transporting troops and munitions of war to different ports and places, and entered into a contract with her owners to carry this purpose into effect.    The vessel was to be officered and manned by the owners, who agreed at all times to keep her in repair and fit for the service in which she was engaged.    In no sense were the United States the owners of the vessel, for they had nothing to do with her management, and only reserved to themselves the right to say how she should be loaded and where she should go.    In the condition of things then existing it became necessary to make provision for two classes of perils.    This was done; the

---

* Reed *v.* United States, 11 Wallace, 591; United States *v.* Kimbal, 13 Id. 636

United States assuming the war risk, while the owners of the boat agreed to bear the marine risk. If, therefore, the stranding of the boat in going over the bar was owing to a peril of the sea, her owners, and not the government, must bear the loss. That the high wind and low stage of water were the efficient agents in producing this disaster are too plain for controversy. They were the proximate causes of it, and in obedience to the rule *"causa proxima non remota spectatur"* we cannot proceed further in order to find out whether the fact of war did not create the exigency which compelled the employment of the vessel. If it did, it was known to the owners when the charter-party was formed, who, with this knowledge, became their own insurers against the usual sea risks, and must abide the consequences of their stipulation.

There is a certain degree of hardship in this case growing out of the peremptory order of the quartermaster to proceed to sea, but this is outside of the contract, and, if worthy of being considered at all, must be addressed to another department of the government.

JUDGMENT AFFIRMED.