## STANDARD OIL CO. OF NEW JERSEY et al. v. ST. PAUL FIRE & MARINE INS. CO.

District Court, S. D. New York.

Jan. 31, 1945.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Ira A. Campbell, Edwin S. Murphy, and Helen C. Cunningham, all of New York City, of counsel), for libelants.

Bigham, Englar, Jones & Houston, of New York City (Oscar R. Houston, and Ezra G. Benedict Fox, both of New York City, of counsel), for respondent.

HULBERT, District Judge.

This is a suit in admiralty upon a certificate of marine insurance.

The case is apparently the first to come up, at least in the Second Circuit, since the outbreak of World War II, presenting for interpretation a F. C. & S. Clause (Free of Capture, Seizure, etc.) and also the scope and effect of the "Held Covered" Clause.

There is no substantial dispute as to the facts, which are found to be as follows:

1. On Oct. 15, 1939, respondent issued an open policy of marine insurance to the Standard Oil Company of New Jersey, as agent, for account of Standard Francaise Des Petroles, a joint stock company organized under the laws of the Republic of France, with loss, if any, payable to Standard Oil Company of New Jersey, or order.

2. The open policy was limited to shipments to be made "direct to French Atlantic port or ports", and, with special clauses annexed, was on a "valued" basis and applied to all shipments of petroleum produced, to be declared by the assured.

3. On April 3, 1940 at Cartagena, Colombia, there was loaded on the Norwegian Motor Tanker Petter, owned by A/S Jensen's Rederi, III, a part cargo of Colombian crude oil.

4. This cargo was originally intended for Norway but on the German invasion of that country prior arrangements were cancelled and on April 27, 1940 the Petter was chartered for a voyage from Cartagena, Colombia, and Texas City, Texas, to Havre, France.

5. The Petter proceeded from Cartagena, Colombia, to Texas City and took aboard the balance of her cargo and sailed from that port on May 2, 1940.

6. The French corporation libelant was the owner of this cargo and the bills of lading called for delivery at Havre.

7. After joining a convoy at Bermuda, the Petter proceeded on the Transatlantic voyage and left the convoy off the Scilly Islands and proceeded to Brest in accordance with instructions of the Commander of the convoy, arriving on May 26th.

8. On June 6, the Petter was allowed by the French naval authorities to proceed to her intended destination but when the master arrived off Havre on June 7 "he heard a bombardment" and put to sea again. A dense fog kept the vessel at sea most of the next day, but about 5 p. m. on June 8, an attempt was made to again enter Havre. There was "no pilot or examination boat out" and the master put to sea again. On the morning of June 9, he "made for Havre again and arrived about 8 A. M." There was no pilot boat and the Petter anchored in the Havre Roads "outside the gate" at 10 A. M.

9. About 11 A. M. "a French Patrol naval boat came alongside and gave orders to leave as quickly as possible for Brest." The Petter left at 11:25 A. M.

On June 14, Havre was entered by the Germans.

10. Meanwhile the Petter arrived at Brest on June 10 at about 5 p. m. and anchored in the outer roads where she remained for a week, during which time her master went ashore daily for instructions from the French naval authorities, and on June 17, received oral instructions from them to proceed to St. Nazaire.

11. While the master of the Petter was making arrangements to leave that evening at 8 p. m. he was warned by a British patrol boat of the approach of the Germans and told to get away as quickly as possible, suggesting Falmouth. The Petter got under way immediately. The Germans entered Brest on June 20th, and France capitulated on June 22nd.

12. On June 18, at 10:15 A. M. when the Petter was about 2½ miles southeast of St. Anthony's Lightship, approaching the port of Falmouth, England, displaying a code flag "G" (meaning in the International Code that a pilot was desired) a patrol boat (a small craft like a trawler) flying the British naval ensign, came out from that port, approached about a ship's length away from the Petter and sounded on her whistle the signal "JT" in the International Code, which means "follow me." Thereupon the Petter hoisted the answering pennant to indicate that the signal was understood.

13. The patrol boat then headed for Falmouth and the Petter followed in her wake, keeping the patrol boat just a little off the port bow so that she could be seen by the wheelsman without interference of the Petter's foremast. The master regulated the speed of the vessel by operating the engine room telegraph and ordered the wheelsman, an AB of thirty years' experience at sea, to follow the patrol boat, which he did, about a ship's length behind. The Chief Officer left the bridge to the master and took up a position as lookout on the forecastle.

14. The waters of Falmouth Harbor had been mined. The officers of the Petter had no information as to the latest minefields since such information was secret.

15. The naval patrol boat, with the Petter following directly behind, headed back into Falmouth Harbor, first on a course north by west. When the naval patrol boat came to a flag buoy, she changed her course to northwest 1/2 west. The Petter followed the course indicated by the naval patrol boat and also turned to port around the buoy. About 10 minutes later and while she was still following directly behind the navy patrol, the Petter, whose draft was 27' 6" forward and 29' aft, struck a submerged rock on her port side, suffering extensive hull damage, ripping out her side and bottom in the way of the port main cargo tanks from No. 1 to No. 7, both inclusive, and rupturing her interior pipe lines, bulkheads and fittings. The pumproom filled up with seawater to the level of the sea outside, and sea water entered the port main cargo tanks. The British naval patrol boat made off at once and was never seen again by the Petter.

16. The rock or shoal on which the Petter stranded was known as the "Old Wall" (indicated by the master when his deposition was taken on an H. O. Chart No. 4529 covering the approach to Falmouth, of which he had a copy in the chartroom aboard the Petter on the voyage in question).

17. Soundings taken as the Petter lay on the rock disclosed 6½ fathoms abreast of the No. 2 port tank, 1½ fathoms midships and 6½ fathoms abreast of No. 8 tank. She lay on the strand until the tide came in and then came off under her own power about 1:30 p. m. that same day.

18. In the meantime, the weather had been fine and the sea calm. With a list to port, the damaged vessel made her way into the outer roads of Falmouth and there anchored. She was not permitted to enter the port of Falmouth because of her leaking condition.

19. As a salvage measure the Tanker San Gerardo was brought alongside and the cargo of the Petter was transferred through the Petter's regular suction lines until it was found they were admitting sea water; thereupon salvage pumps were installed in the Petter's cargo tanks from overhead and the oil was thus transferred into the San Gerardo. This operation was completed on July 2, 1940 when the Petter was dry-docked at Cardiff. Her cargo, which had been transferred to the San Gerardo was examined by cargo experts employed by the Petter's shore agents and disclosed some contamination by sea water; also a shortage from bill of lading weights.

20. The ship's agents undertook to dispose of the damaged cargo. The respondent was represented in conferences which took place; the cargo was offered for sale and various petroleum interests were solicited. An offer was received from Lisbon which could not be accepted because the British authorities refused permission to send the cargo to that port. Finally, the Canadian Eagle Oil Company offered to purchase the damaged cargo at 10 U. S. cents per barrel. Thereupon the shipowner, through the Norwegian Shipping & Trade Mission, applied to the British Admiralty Court to obtain an order dated July 10, 1940, directing that " * * * the cargo lately laden on board the M. T. Petter now laden on board S. S. San Gerardo be sold, such sale to be by private treaty other than by the Admiralty Marshal."

21. In addition to the cash consideration paid by the purchaser, the Eagle Oil & Shipping Co. Ltd., through whom the sale was made, waived its "salvage" or demurrage claim for the time occupied by the San Gerardo in holding the oil. The cash proceeds of the cargo, $10,124.40, were lodged in court. The invoice value of the cargo was $119,650.41 and the freight prepaid to the owner of the Petter, $184,995.72; the value stated in the certificate of insurance calculated pursuant to clause VI as amended was $346,515.00, and the recovery sought as the salvage loss is the difference between the value and the salvage recovery, or $336,390.60.

### Discussion.

The libelant raised, upon the trial, the sufficiency of the respondent's answer to enable it to argue the abandonment or termination of the voyage, and therefore, the release of the insurer from liability under its policy.

While it is true that Admiralty Rule 26, 28 U.S.C.A. following section 723, provides:

"* * * and all answers shall be full and explicit and distinct to each separate article and separate allegation in the libel, in the same order as numbered in the libel * * *."

"It is the practice in Admiralty to bring all parties before the Court and to determine the controversy on the merits as it appears from the proof regardless of technicalities of pleading, *provided that no party is surprised or prejudiced.*" (italics supplied) Benedict on Admiralty, Sixth Edition p. 478, Vol. 2.

Surprise cannot justifiably be claimed in this case. The burden was on the libelant to prove a loss while the policy was in effect. The respondent's claim to termination of liability is based entirely upon the libelant's proof. Some time after insured filed proof of loss, the insurer wrote claiming "abandonment of the voyage." Libelant entered suit with this knowledge. At all events it does not appear to have been intentionally discarded.

In re The Bencleuch (The Ellerdale), D.C., 3 F.2d 824, 825, 1925 A.M.C. 383, it was said: "The court is of the opinion that, if the respondent had pleaded in its answer that the stipulations contained in the bill of lading control, a very serious question might be presented. (citing cases) But this was not set up in the answers and cannot be urged unless pleaded. * * * This was recognized by respondent, who sought to amend in the Bencleuch case long after the trial was concluded and an interlocutory decree entered. The libellant objected vigorously, and the court concluded that it was not justified in granting an amendment of such importance, where the respondent had been so derelict and denied the motion on the ground of laches."

On appeal, the Circuit Court of Appeals (2 Cir.) disapproved and stated the amendment should have been allowed. 10 F.2d 49.

I shall not preclude the consideration of the issue presented by the respondent.

Was the cargo insurance here involved in full force and effect at the time the Petter stranded on the "Old Wall"? The voyage had not terminated, as contended by the respondent, upon the dropping of the Petter's anchor in the roads off Havre, just outside the gate. The master testified there was no pilot or examination boat out, and it is well settled in custom and in law, that a ship may not move into port and berth without first being cleared by the authorities, hence the Petter never made an arrival in Havre and the voyage did not there terminate.

In Dickey v. United Insurance Company, 11 Johns., N.Y., 358, it was held that a ship arriving off Havana and not having been cleared by the authorities, at the time of the loss, had not arrived at the end of her voyage.

While the facts are not altogether analogous, the underlying principle of law seems applicable to the case at bar.

A further reason for holding that the insurance was in full force and effect, is found in Clause 8 of the typewritten form attached to the policy, which states: "'Against all risks whatsoever (excepting as hereinafter provided) from time of leaving tanks at port of shipment and whilst in transit and/or awaiting transit and until safely delivered in tanks at destination, but notwithstanding anything herein to the contrary the Assurers are not liable for shortage and/or leakage and/or contamination (except as elsewhere in this policy provided) unless caused by or arising out of the vessel or craft being stranded, sunk, burnt, in collision or in contact with any substance or thing (ice included) other than water, fire, explosion (howsoever and wheresoever occurring) or there be a forced discharge of cargo; provided, however, that these Assurers are liable for contamination resulting from stress of weather; claims are to be paid irrespective of percentage, but subject to deduction for normal shortage' but excluding the risks excepted by the F. C. & S. Clause and S. R. & C. C. Clauses."

It is not contended that any cargo was unloaded at Havre, nor at Brest, as the facts, which are not in dispute, clearly in-

dicate, and since the oil was still aboard the vessel at the time of the strand, it cannot properly be said that the insurance terminated if Clause 8 is read in conjunction with the "Held Covered" clause (Clause 11 on the attached typewritten form) which provides: "Held covered at an additional premium, if required, in case of deviation or change of voyage or vessel or other variation of the risk or of any inadvertent omission or unintentional error in the description of the interest, vessel, voyage or amount or in the event of any interruption of the voyage or transportation from any cause."

This latter clause in and of itself is sufficient reason for holding that the insurance coverage continued, as it provided for changes in the voyage, such as occurred when the vessel proceeded to Brest and then to Falmouth.

This clause was written in very broad terms at a time when a state of war existed in Europe, with every prospect that the conflagration was likely to spread. Thus the respondent was put on notice that the risks involved in a voyage of the nature of the one here presented, would undoubtedly be expanded. If the assurer did not wish to assume these risks, it could have terminated the contract pursuant to its terms on fifteen days' notice.

Further evidence of the fact that respondent had notice of the increased hazard and possibility of a necessary change of voyage is found in the assurer's letter relating to the "Wartime Marine Surcharge", dated May 11th, 1940, during the existence of the policy which was originally issued October 15, 1939.

It would be fair to assume that the changes of voyage such as were here involved, in which the Petter was forced to leave Havre and proceed to Brest and Falmouth, were required in order to protect the cargo and vessel from loss.

■ The "Held Covered" clause and Clause 8, both quoted above, are among a number of typewritten clauses attached to the policy, and pursuant to paragraph 19 thereof, as well as the ordinary rules of construction, were in addition to those in the printed policy form and where in conflict, superseded them.

There are no conditions in the "Held Covered" clause which the libelants failed to meet; as a matter of fact, the libelants gave notice of the change of voyage, although not required to do so under said clause, by a letter dated June 20, 1940, which would seem to be timely, even if it had been required.

■ The libelants also contend that the "Blockade Clause" applies, but with this contention I disagree.

Having determined that the insurance policy was in force at the time of the stranding of the vessel, I pass on to the question of whether or not the loss was a Marine risk.

The F. C. & S. clause was printed in the main body of the policy and provides: "This insurance is warranted free from capture, seizure, arrest, restraint, detainment, confiscation, preemption, requisition or nationalization, and the consequences thereof or of any attempt thereat, whether in time of peace or war and whether lawful or otherwise; also warranted free from all consequences of hostilities or warlike operations (whether there be a declaration of war or not), piracy, civil war, revolution, rebellion or insurrection, or civil strife arising therefrom."

It is asserted by the respondent that the strand of the vessel was a consequence of hostilities and warlike operations.

■ It is well settled that the fact that there is a war in progress, or that there are surrounding circumstances of war, in and of themselves, are not sufficient to exclude coverage under a policy containing a F. C. & S. clause, but it must be shown that a cause of loss contemplated by such a clause was the cause "nearest to the loss". Queen Insurance Company of America v. Globe & Rutgers Fire Insurance Company, 263 U.S. 487, 44 S.Ct. 175, 68 L.Ed. 402.

It is argued by respondent that the cases, Muller v. Globe & Rutgers Fire Ins. Co. of City of New York, 2 Cir., 246 F. 759, and Standard Oil Company of New Jersey, as Owner, etc., of the Steamship Llama, v. United States of America, 267 U.S. 76, 45 S.Ct. 211, 69 L.Ed. 519, are applicable to the case at bar.

I do not agree with this contention. In the latter case the vessel was boarded by an armed boarding party from a British warship. The lieutenant in charge of this party received instructions from the warship directing him to pursue a certain course, and while following these directions the vessel was lost. The court held that

since control of the vessel was taken from the hands of the "owner" without his consent and was lost while thus held by a paramount power, the loss was fairly attributed to the taking.

In the former case too, the vessel lost had been boarded by a boarding party from a British warship and was under the control of such party at the time of the loss. The court said [246 F. 763]: "* * * There was no time when the shipmaster was left to navigate his own ship in his own way; she was lost while he was doing what he had to do. * * *"

In the case at bar, the facts are quite different. Approaching Falmouth, the Petter signaled for a pilot; subsequently a British trawler came out from Falmouth and signaled "Follow me", which the Petter did. There is nothing disclosed in the evidence to indicate that this trawler was armed or that the master acknowledged her authority or did anything more than accept her aid; no boarding party boarded the Petter, and the master was in control of the operations of his vessel at the time of the strand. Immediately after the strand the British trawler disappeared and was not seen again by the master of the Petter. This latter act of the trawler strongly supports the view that the Petter was not in control of a paramount power at the time of the loss. The logical conclusion to be drawn is quite the opposite, and is not consistent with the exercise of naval authority.

The master of the Petter testified that he followed the "orders" of the French and British naval authorities at Havre and Brest because he felt it was necessary so to do, in order to get away from the German Armed Forces, although he considered that they had no authority over him as a Norwegian officer of a vessel flying a Norwegian flag.

Furthermore, when the British patrol off Falmouth signaled "Follow me" he accepted the offer because there was no pilot and he did not want his ship lying outside because of his suspicion of the presence of submarines and that the entrance to the Harbor was mined.

The loss claimed was not proximately caused by hostilities or warlike operations, nor was it within any of the other provisions of the F. C. & S. clause, as contended by the respondent, and consequently it must be held to have been a marine loss. Queen Ins. Co. v. Globe & Rutgers F. Ins. Co., supra; British S. S. Co. v. The King, 1921, 1 A.C. 99, and Morgan v. United States, 14 Wall. 531, 20 L.Ed. 738.

### Conclusions of Law.

1. This court has jurisdiction of the parties and of the subject matter of this litigation.

2. The policy issued by the assurer was still in effect.

3. The loss complained of was a marine risk.

4. The libelant Standard Oil Company of New Jersey is entitled to recover the damages sustained.

A Commissioner will be appointed to take proof, compute, and report the damage, unless the parties are able to agree upon the amount.

The libelants are entitled to a decree accordingly, with costs.