### THE E. H. BLUM.

### ATLANTIC REFINING CO. v. UNITED STATES.

No. 211 of 1944.

District Court, E. D. Pennsylvania. Nov. 21, 1947.

Lewis, Wolff & Gourlay, by Otto Wolff, Jr., all of Philadelphia, Pa., for libellant.

Gerald A. Gleeson, U. S. Atty., of Philadelphia, Pa., Russell L. Hiller, Asst. U. S. Atty., of Reading, Pa., and A. W. Knauth, Attorney, Department of Justice, of New York City, for respondent.

KALODNER, Circuit Judge.

The S.S. "E. H. Blum" stranded while being navigated through dense fog as she was bound up the Atlantic coast for Delaware Bay. This libel in admiralty is the outcome of that event. The vessel had been time chartered by her owner, the Atlantic Refining Company, the libellant herein, to the United States acting through its agent, the War Shipping Administration. Full charter hire is sought, and that is the over-all problem of the case.

The primary question for determination is whether the stranding was " * * * *caused or contributed to by war or warlike acts * * *"* and/or certain other forces enumerated in the charter agreement.

The cause having been presented to the court without a jury, on the basis of the pleadings, stipulations, and evidence, I make the following

## Findings of Fact.

1. The libellant, the Atlantic Refining Company, was at all times pertinent hereto a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with principal offices in the City of Philadelphia, Pennsylvania, and was at all times pertinent hereto the owner of the S.S. "E. H. Blum."

2. The respondent is the United States of America and has consented to be sued herein.

3. The S.S. "E. H. Blum," a tanker, was built in 1941 for the libellant. She measured 523.10 ft. x 70.2 ft. x 39.7 ft. and had a dead weight capacity of 19,200 tons, a single rudder, a single screw propelled by a 5,000 hp electric motor; she was capable of 13.4 knots per hour. There were twenty-seven cargo tanks, nine on each side and nine in the center line. The pump room was located between the No. 5 and No. 6 tanks.

4. On one of her first voyages, the S.S. "E. H. Blum" was damaged to the extent of a constructive total loss; the arranged total loss was $2,350,000, an allowance of $500,000 being made for the wreckage. The underwriters conveyed any interest they may have had in the S.S. "E. H. Blum" to the libellant by quit claim deed.

5. On November 26, 1942, following completion of repairs to the S.S. "E. H. Blum," the respondent, through Emory S. Land, Administrator, War Shipping Administration, and the libellant agreed to a requisition time charter, designated Contract No. WSA 3650 R, and on or about November 27, 1942, pursuant to the terms of the charter, the S.S. "E. H. Blum" was duly delivered to the respondent.

6. On December 8, 1942, the respondent, through the War Shipping Administration, gave notice to the libellant that it had been assigned the S.S. "E. H. Blum" for the purpose of conducting the business of the respondent under a Service Agreement (Warshipoil TCA) between the respondent and the libellant (WSA–633) dated August 27, 1941, subject to the terms and conditions set forth therein. Pursuant to Article I of the said service agreement, the libellant was appointed as agent, and not as an independ-

ent contractor, to conduct the business of the United States with respect to tank vessels chartered by the United States and assigned to the agent. Said assignment was accepted by the libellant.

7. At the request of the libellant, a voyage charter party was arranged for the "E. H. Blum" (Voyage R–1, Tanker Voyage Charter Party, November 30, 1942) by and between the libellant and the respondent, acting through the War Shipping Administration. The agreement, in effect, called for one voyage in ballast to Atreco, Texas, for a cargo of crude oil owned by the libellant, and thence to Philadelphia.

8. On December 19, 1942, a "Tanker Bill of Lading" was isued at the port of Atreco, Texas, for 140,750 net barrels of fortified West Texas-New Mexico crude oil, aboard the "E. H. Blum," Allen D. Tucker, Master, to be delivered at Philadelphia to the libellant herein.

9. The Master of the "E. H. Blum" at all times pertinent hereto was Allen D. Tucker. At the time of the taking of his testimony, May 6, 1946, he was 61 years of age. He held a Master's license, unlimited, for all oceans since about 1911 and various pilot's licenses, including pilot's license for the waters herein involved. He was made a Lieutenant Commander, Naval Reserve, in 1928, and has served as Master on merchant ships since 1916, throughout World War I and until the stranding of the "E. H. Blum," after which he was recalled to active duty in the Naval Reserve. He was then assigned as assistant port director for petroleum at Port Arthur, Texas, and within a short time became port director. When in command of the "John D. Gill," about March 13, 1942, his vessel was torpedoed in the vicinity of Frying Pan Shoal, south of Diamond Shoal. In May, 1942, while in command of the "Robert H. Colley," after being detached from a convoy off Key West, his vessel was pursued by submarines for two nights.

10. In 1942 the German-Italian attempt to halt allied transport was at its peak.

11. On the morning of December 29, 1942, the "E. H. Blum," carrying an armed guard, fully laden and drawing between thirty and thirty-one feet, was part of a naval convoy bound up the Atlantic coast for New York. The convoy comprised about sixteen vessels arranged in four columns, each vessel being approximately 500 yards apart. The "E. H. Blum" was in one of the inner columns well up in front. While in convoy, depth charges were heard, some shaking the "E. H. Blum," but it was not known whether submarines were actually in the vicinity.

12. At about 10 A.M. on December 29, 1942, the "E. H. Blum" received an order, by pre-arranged signal, detaching her from the convoy, and at about 10:25 A.M., the "E. H. Blum" departed for the Delaware River pursuant to instructions.

13. Throughout the evening of December 28, 1942, while the "E. H. Blum" was in convoy, and continuously thereafter until the "E. H. Blum" stranded, the weather was foggy and misty making it impossible for those in charge to determine her exact position by means of celestial navigation. At about 1 P.M., December 29, 1942, the fog thickened and for at least two hours before the stranding the fog was dense. The fog horn was sounded. The winds encountered on December 29, 1942, before the stranding, were mild, of force 2 to 4, Beaufort Scale, varying from South, Southeast and Southwest.

14. At about 7:30 A.M. on December 29, 1942, those in charge of the navigation of the "E. H. Blum" determined her latitude by a sight on the pole star, and her longitude by dead reckoning, and estimated their position at 7:42 A.M. to be latitude 37 degrees 23.5 minutes north, and longitude 73 degrees 52 minutes west.

15. From 7:42 A.M. to 10:25 A.M., December 29, 1942, the convoy, including the "E. H. Blum," covered approximately four miles. After being detached from the convoy, those in charge of the navigation of the "E. H. Blum" estimated, by dead reckoning, that her position at 10:25 A.M. was approximately latitude 37 degrees 28 minutes north, and longitude 73 degrees 51 minutes west. Upon being detached, those in charge of the "E. H. Blum" were not given the convoy position, but they were as able to determine their position as anyone else either in or connected with the convoy.

16. After being detached from the convoy, the Master of the "E. H. Blum" determined to get into the coastal waters as soon as possible, where, in his opinion, the submarine menace would be less and where he might contact a patrol boat. Taking his departure at 10:25 A.M. from the point where he had estimated his then position, he headed his vessel on a course 314 degrees true and held that course until 2:30 P.M. at full speed estimated to be 12 knots, except when he slowed down for soundings at 1 P.M., 2 P.M., and 2:30 P.M. The sounding at 1 P.M. showed no bottom at thirty fathoms; at 2 P.M., 20 fathoms, yellow sand; and at 2:30 P.M., 17 fathoms, fine gray sand. The soundings indicated that the course and estimated position at 2:30 P.M. was correct. The distance traveled between 10:25 A.M. and 2:30 P.M. was about 48 or 49 miles.

17. At 2:30 P.M. the Master determined to, and did, change his course to 347 degrees true, heading just off the eastern Fenwick Island Shoal Whistle Buoy, located in latitude 38 degrees 25.2 minutes north, longitude 74 degrees 45.9 minutes west, and held that course until the vessel stranded at 6:40 P.M., December 29, 1942. The waters along the course plotted by the Master, 347 degrees true, are of sufficient depth to enable safe passage of a vessel of the type and draft of the "E. H. Blum."

18. While the "E. H. Blum" was on the course 347 degrees true, soundings were taken, on December 29, 1942, at 3:30 P.M., showing 13 fathoms, yellow sand; at 4:30 P.M., showing 11 fathoms, fine white sand; at 5:40 P.M., showing 13 fathoms, white sand with black specks; and a sounding was being taken at 6:40 P.M. when the "E. H. Blum" stranded.

19. For the "E. H. Blum," full speed was 13.4 knots. However, as preparation for anything that might be encountered, the number of revolutions of the engines was reduced, so that full speed was 12 knots, half speed, about 7 knots, and slow speed, about 3½ to 4½ knots. All soundings were taken at slow speed. Within an hour prior to the stranding, the "E. H. Blum" was on slow speed; between the sounding at 4:30 and that at 5:40, she was on half speed.

20. All soundings were taken with a 70 pound lead line, specially made for that purpose, by the Chief Officer who was an experienced and capable leadsman. The "E. H. Blum" was not equipped with a fathometer. She was equipped with a sounding machine in good order and condition, but for practical reasons the sounding machine was not used. In shallower waters, the lead in the hands of an experienced leadsman furnishes a sounding at least as accurate as the sounding machine.

21. The "E. H. Blum" was also equipped with a course recorder in good order at the beginning of the trip, but later out of order. There was no opportunity to have it repaired.

22. The "E. H. Blum" was equipped with a radio direction finder which had been calibrated within a few weeks prior to December 29, 1942. At 3:30 P.M. on December 29, 1942, the Master of the "E. H. Blum" obtained a bearing of 344 degrees true on Overfalls Lightship, a radio beacon station. Attempts at that time to obtain the bearing of the radio beacon station at Cape Henry were unsuccessful because of heavy static. The bearing of Overfalls Lightship at 4:30 P.M. was 343 degrees true, and at 5:40 P.M. it was 341 degrees true. These bearings indicated that the "E. H. Blum" was inside the anticipated course, that the angle on Overfalls Lightship was widening, and that the vessel was headed in an easterly direction away from shallower waters.

23. It was essential that the "E. H. Blum" reach a suitable anchorage before nightfall on December 29, 1942. The Master determined to anchor in nine fathoms at a point above and to the west of the eastern Fenwick Island Shoal Whistle Buoy, located in latitude 38 degrees 25.2 minutes north, longitude 74 degrees 45.9 minutes west. This was a desirable anchorage from the point of view of the submarine menace and that of traffic avoidance.

24. The Master took into consideration the wind, swell, current and tide, but concluded that they were not such as to warrant changing the course of his vessel.

25. The "E. H. Blum" was a good steering ship, easy to handle, and was at all times

kept on the assigned course by the helmsman.

26. The "E. H. Blum" stranded at 6:40 P.M., December 29, 1942, on a four fathom shoal determined to be in latitude 38 degrees 24.4 minutes north and longitude 74 degrees 55.45 minutes west, between three and four miles west of the point where the Master had intended to anchor for the night. It was still daylight. The distance between the point of departure at 2:30 P.M. and the point of stranding was approximately 26 or 27 miles. At the time of the stranding, the Master was about ready to anchor, believing that he was abeam, and to the west, of the eastern Fenwick Island Schoal Whistle Buoy.

27. The point of stranding was approximately eight miles west and abeam of the eastern Fenwick Island Shoal Whistle Buoy, and above Isle of Wight Shoal. It was about eight miles inside the Master's original anticipated course, and about three to four miles west of where he thought he was just prior to the stranding.

28. Following the stranding, unsuccessful efforts were made to float the "E. H. Blum" by putting her engines astern at various speeds. A bow anchor was let down. Gradually she changed her heading from 29 degrees to 270 degrees. She was then full aground. Nothing more was done, except to send radio calls for aid. At about 10:00 P.M. a loud detonation was heard amidships and a survey disclosed a crack in the center line bulkhead of No. 5 tank with oil flowing into the pump room. Cargo was shifted from No. 5 tank to the after cofferdam and to No. 7 tank to relieve pressure on the crack and to prevent further flooding of the pump room.

29. At about this time, a surf boat from Ocean City came along to stand by, but it was directed to keep out of the heavy oil slick about the "E. H. Blum" since the oil was especially inflammable in water. A no smoking order was given aboard the "E. H. Blum".

30. At about 4 A.M. on December 30, 1942, the Navy tug "Allegheny" which had been seeking the "E. H. Blum" for some time in the fog, finally made contact, but was directed to stand by because of the thick fog.

31. At about 8 A.M. on December 30, 1942, soundings were taken showing 30 fathoms all around the "E. H. Blum," except amidships, which was 28 fathoms. The soundings were approximate because of the oil slick and rough seas.

32. At about 8 A.M. on December 30, 1942, unsuccessful attempts were made to float the "E. H. Blum" with the aid of a line to the tug "Allegheny." At that time the wind, southerly, was very strong and there was a heavy sea which washed the decks of the "E. H. Blum," lying broadside to the sea. The weather did not moderate until evening.

33. While the tug "Allegheny" was changing her position, the tug "Samson" came along to help. The "Samson" pulled on the bow most of the day. The engines of the "E. H. Blum" were also used until about noon, when the steering engine broke, and it was found that the rudder post was twisted. Neither tug was able to move the "E. H. Blum."

34. At about 8 P.M. on December 30, 1942, the Master determined to jettison the cargo. The pump room being flooded with oil and since only the valves for the center line tanks had been open, only the cargo from these tanks could be jettisoned. The cargo was discharged all along the vessel as evenly as possible. When lightened, the "E. H. Blum" started to roll somewhat, the bilges striking the bottom. The "Allegheny" was then able to swing the "E. H. Blum" fifteen or twenty degrees, but was unable to move her off the shoal.

35. At about 10 P.M. on December 30, 1942, a series of detonations were heard amidships. The Master directed that all the power lines be pulled out from amidships, in anticipation of the vessel breaking in half, to avoid the possibility of setting fire to the oil. About 1 A.M. on December 31, 1942, the "E. H. Blum" broke in half. The crew abandoned ship. The bow remained stuck on the shoal, but the stern came around toward the port side of the bow.

36. The cargo was not jettisoned earlier because lightening of the ship would have subjected her to the pounding of the seas, and the ship would have been set further up on the shoal. It is good practice not to jettison cargo except as a last resort.

37. The Master of the "E. H. Blum" navigated on U.S.C. & G.S. Chart No. 1109 (Cape May to Cape Hatteras). This was a proper chart to use.

38. Prior to the stranding, the Master of the "E. H. Blum" did not use his radio to obtain his position from radio compass stations. A confidential memorandum to masters of all merchant ships, dated April 10, 1942, was issued by Rear Admiral Adolphus Andrews, Commander, Eastern Sea Frontier, which communication read, in part, "Maintain radio silence except in case of extreme emergency (this is very important)" Prior to the stranding, the Master of the "E. H. Blum" was not confronted with extreme emergency on this voyage.

39. In normal, peacetime navigation, a merchant vessel bound from the Gulf of Mexico for the Delaware River followed a course up the Atlantic coast to Diamond Shoal Lightship, off Cape Hatteras, then to Winter Quarter Lightship, off Assateague Island, then on a course 18 degrees true, towards Five Fathom Bank Lightship, off the Delaware Capes, until Overfalls Lightship gave the course 332 degrees true, to Delaware Bay. These lightships were equipped as radio beacon stations so that in foggy weather their bearings could be obtained by means of the vessel's radio direction finder. Radio bearings so obtained may be used to determine the position of a vessel in the same manner as sight bearings.

40. Radio beacon stations are divided into three main classes: Class A, high power, range of about 200 miles; Class B, intermediate power, range of about 100 miles; Class C, low power, range of about 20 miles. As of December 29, 1942, the following radio beacon lightships had been removed and replaced by buoys: Frying Pan Lightship (Class B), January 11, 1942; Diamond Lightship (Class A), January 11, 1942; Chesapeake Lightship (Class B), January 15, 1942; Winter Quarter Lightship (Class B), January 9, 1942; Five Fathom Lightship (Class B), January 14, 1942; and Barnegat Lightship (Class B), January 14, 1942.

41. Radio beacons were also located at Wolf Trap, Va., Smith Point, Va., Sandy Point, Md., and Cove Point, Md. These were low power stations on the westerly shore of Chesapeake Bay.

42. Radio beacon station bearings are normally reliable within one or two degrees. Reliability increases at closer range, and within 25 miles of a Class B station the error is negligible. Reliability is also affected by atmospheric conditions, the best time for reception being in the winter months. Reliability is also affected within one hour before and after sunrise and sunset, and at night.

43. Ullage is the distance, in feet, between the surface of oil in a tank and the ceiling of the tank. The ullage report after loading of the "E. H. Blum" at Atreco, Texas, December 19, 1942, shows ullage for the No. 1 port tank was 3 ft. 11¾ inches and for the No. 1 starboard tank, 3 ft. 10½ inches. Ullage for the first five center tanks was: No. 1, 24 ft. 5 inches; No. 2, 4 ft. 0-½ inch; No. 3, 4 ft. 1½ inches; No. 4, 3 ft. 11½ inches; No. 5, 4 ft. 3½ inches. The ullage report made after the bow section of the "E. H. Blum" reached Port Mifflin showed ullage for the No. 1 port tank was 14 ft. 7¼ inches and for the starboard No. 1 tank, 18 ft. 7 inches. Ullage for the first five center tanks was: No. 1, 13 ft. 11½ inches; No. 2, 18 ft. 10 inches; No. 3, 24 ft. 9½ inches; No. 4, 29 ft. 11 inches; No. 5, 0. After the stranding and breaking of the "E. H. Blum," the wreckers moved oil among the tanks of the bow section to enable them to loosen that section from the shoal.

44. The vessel, "E. H. Blum," did not become a constructive total loss as a result of the stranding referred to herein.

45. All hours of the day referred to herein were Eastern War Time.

46. The respondent has paid to the libellant the sum of $319,326.46.

47. No supposed unseaworthiness of the "E. H. Blum" contributed to the stranding. The libellant did not fail to use due diligence to keep the "E. H. Blum" working.

## Discussion.

As indicated at the outset, the problems of the instant case center about the charter party arrangement between the libellant and

the respondent. Since the parties have stipulated that the "E. H. Blum" was not a constructive total loss as a result of the accident herein involved, the controlling features of the charter party are contained in Part II thereof (7 F.R. 4589).

Clause 4 of Part II of the agreement provides:

"Payment of hire hereunder shall be reduced one-half to the extent that time is lost to the Charterer:

"(a) If the Vessel is prevented, in whole or in part, from working because of a deficiency of men or stores while the Vessel is in the continental United States excluding Alaska, or because of breakdown of machinery, collision, stranding, or fire or other accident or damage to the Vessel; or

"(b) Because of breach of orders or neglect of duty by the Master, officers or crew; Provided, however, That, except to the extent that loss of time is caused by the failure of the Owner to exercise due diligence to keep the Vessel working and to prevent loss of time, payment of hire shall not be reduced because of: (i) The happening of any event listed in (a) above caused by the fault of the Charterer or caused or contributed to by war or warlike acts, sailing in convoy, operating (contrary to peacetime custom) without lights or pilots, navigating or mooring in (contrary to peacetime custom) unlighted, unbuoyed, or overcrowded waters, excessive usage (because of war or warlike conditions) of machinery or equipment, navigating (contrary to peacetime custom) under the direction of naval, military, coast guard or other governmental authorities, discharging alongside ships or into ships, or ice if loss of time due to ice damage does not result from wilful negligence or default of the Owner, Master, officers or crew; * * , *"

Clause 14 provides, in part:

"Subject always to the direction of the Charterer, the Master shall prosecute his voyage with the utmost dispatch, use due diligence to care for the cargo, and shall render all reasonable assistance with the Vessel's crew and equipment. * * *"

The libellant also considers Clause 19 applicable:

"The Vessel, her Master and owner, shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage or delay of failure in performing hereunder, arising or resulting from: Any act, neglect, default or barratry of the Master, pilots, mariners or their servants of the Owner in the navigation or management of the Vessel; fire, unless caused by the personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damages arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer, the owner, shipper or consignee of the cargo, their agents or representatives; insufficiency of packing, insufficiency or inadequacy of marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault of privity of the Owner. And neither the Vessel, her Master or Owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss or damage or delay or failure in performing hereunder arising or resulting from: Act of God, act of war; act of public enemies, pirates, or assailing thieves; arrest or restraint of princes, rulers of people, or seizure under legal process; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion. The Vessel shall have liberty to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in distress and to deviate for the purpose of saving life or property or of landing any ill or injured person on Board. No exemption afforded to the Charterer under this clause shall diminish its obligations for hire under the other provisions of this Charter."

Clause 19 is the usual catch-all incorporated in charter parties. I do not con-

sider that it affects the operation of Clause 4, which deals particularly with the liability of the Charterer for hire under specified circumstances.

It should be noted that while the libellant seeks to recover full hire for the time the "E. H. Blum" was prevented from working by reason of the stranding, it is admitted that the respondent had, prior to the institution of the libel, paid half hire. The respondent now contends, however, for reasons later stated, that not even half hire was due. Whether half or full hire is the extent of respondent's liability, by stipulation of the parties, upon a decree the cause will be submitted to a Commissioner for the determination of the exact amount of hire due the libellant. With the actual amount of hire, therefore, the Court is not concerned at this time.

The libellant takes the position that the Master of the "E. H. Blum" was not negligent in the navigation of his vessel and that full hire is due because (1) the vessel was required to proceed up the Atlantic coast in convoy and was detached from the convoy by direction of the naval authorities far to the seaward of the customary lanes of traffic followed by merchant vessels in peacetime bound from the Gulf to the Delaware; (2) the radio beacon lightships at Diamond Shoal, Winter Quarter Shoal and Five Fathom Bank had been removed, thereby preventing the Master of the "E. H. Blum" from plotting his position by means of their radio beacon signals; and (3) the use of the radio on the "E. H. Blum" was forestalled by direction of naval authorities, thereby precluding her Master from obtaining his position by radio from radio compass stations along the coast. Further, libellant asserts that the stranding was caused or contributed to by the fact that she was sailing in convoy and by the fact that after being detached from the convoy, she was required by the naval authorities to navigate, contrary to peacetime custom, in unbuoyed waters.

The respondent takes the position that the stranding of the "E. H. Blum" was caused solely by negligent navigation and therefore the libellant is entitled to, at most, only half hire. But it is also contended that the hire already paid was not in fact due because the vessel was not diligently maintained in a seaworthy condition with devices necessary for navigation in a dense fog and because there was a lack of diligence in placing experienced salvage men on the vessel immediately upon the stranding.

The respondent contends that the Master of the "E. H. Blum" was negligent (1) with respect to his choice of course after separation from the convoy, (2) with respect to his choice for anchorage, (3) in failing to take more frequent soundings, (4) in failing to allow for the set of the current, (5) in using and in the manner of using the lead to take soundings, (6) in failing to stream a taffrail or patent long, (7) in failing to use larger scale charts, and (8) in failing to head eastward at a greater angle, sufficient to verify his position by two-point bearings on Overfalls.

The record is complete insofar as the navigation of the "E. H. Blum" is concerned. It discloses the difficult set of circumstances under which this Master was obliged to navigate. Certainly the Master is not automatically negligent if someone be found to say that he would have done it differently. Nor is it, a fortiori, negligence if the Master made an error, as long as his conduct was not unreasonable and not unjustifiable under the circumstances at the time he was navigating. The Battler, 3 Cir., 1896, 72 F. 537, cert. denied 163 U.S. 697, 16 S.Ct. 1204, 41 L.Ed. 319. The Socony No. 9, 2 Cir., 1934, 74 F.2d 233, cited with approval in Atlantic Refining Co. v. Moller (The Laura Maersk), 320 U.S. 463, 64 S.Ct. 225, 88 L.Ed. 168, 1943 A.M.C. 1321.

The testimony of experts such as those produced by the respondent is always of value to the court, particularly where specialized knowledge is necessary. It requires but little judicial experience, however, to recognize that such evidence must be taken with care. In the instant case there is a large obstacle in the path of full acceptance of the experts' views: the patent failure of respondent's experts to fully comprehend the plight of a master faced with the necessity of immediate and decisive action, from which there was no turning

back. The testimony of Cross and Storey, both of whom appeared on behalf of the respondent, anent the frequency of soundings is emphatic of this conclusion. Cross stated that he would have taken soundings every ten or fifteen minutes at a speed of three or four knots once within the 100-fathom curve; also, he would have preferred to anchor, if at all, in the vicinity of Overfalls. Storey testified that he would have taken soundings every ten or fifteen minutes while stopped or at a speed of two or three knots. He also testified that had he been in a dense fog, he would have tried to anchor before nightfall somewhere in the shallow waters in the vicinity of Fenwick Island, thus approving of the Master's plan in this case. It was successfully shown, however, by measurement on the charts, that in view of the distance that had to be traversed before any of the experts, or the Master, could have anchored, it would have been impossible to take such frequent soundings as advocated by Cross and Storey and yet reach the anchorages they deemed prudent. Moreover, it was conceded that the speeds advocated would have made the vessel more susceptible to any current that existed, and that the charts did not have sounding notations at such frequent intervals. It is quite plain that the Master had to select between the two alternatives. I do not believe that on such testimony the Master can be convicted of negligence, particularly in view of the indications he had as to the correctness of his reckoning.

Then, too, Cross and Storey thought it highly desirable that the Master determine his position and distance from Overfalls Lightship by taking a two-point bearing. This involved leaving his course on a 75 or 90 degree angle, eastward, and running for about ten miles. The Master was fully aware of this possibility, but determined against it because (1) all the indications were that he was proceeding safely, (2) the taking of a two-point bearing would have required his going into deeper waters where he ran the risk of encountering enemy submarines and, later, traffic, and (3) the taking of such bearings would have delayed him at least two hours and prevented him from reaching a safe anchorage before nightfall. These reasons, in my opinion,

are sufficient justification for the action of the Master. As already noted, the evidence affirmed the desirability of anchoring in the vicinity of Fenwick Island Shoals before nightfall. Again, the Master had to make a choice: he could not do both.

Further evidence as to the large range of preference involved and of the inability of the respondent's naval experts to appreciate fully the difficulties to be met by the Master exists in the testimony of Cross that he would have preferred to anchor in the vicinity of Overfalls, and that if he had a "perfect fix" he would have entered the capes. Not even Storey suggested that. The one undoubted fact in this case is that the Master did not have and could not obtain a "perfect fix." Moreover, to anchor in the vicinity of Overfalls, he would have had to cross the regular lane of traffic, thus also increasing the risks involved.

Storey believed that the submarine menace was no worse than the risk of stranding and that being torpedoed would not result in a greater sacrifice than running aground. Obviously, it is a matter of personal choice, but I am inclined to the view that not many would agree with Commander Storey. The submarine menace was very real at the time here involved and in the area in which the "E. H. Blum" was being navigated. It was in realization of this fact that the Master was prompted to reach, and continue in, the shallower waters to the westward. His conduct in this repect was far from negligent, and in choosing the one risk over the other he cannot be said to have acted unreasonably.

It is readily apparent that both of respondent's experts were more concerned with criticising particular decisions of the Master than with determining the propriety of his navigation under all the circumstances prevailing. Neither attempted to say, although it is true neither was asked, what he would have done from beginning to end. Only Crenshaw, the libellant's naval expert, did that, but, as might be expected, he approved the Master's choice throughout. Nevertheless, his testimony is not without weight.

The testimony of Cross and Storey was taken by deposition; That of Crenshaw and practically all of that of the Master, in

court. While the Court has no doubt as to the sincerity and integrity of the respondent's witnesses, having seen and heard the Master and Crenshaw, it is obliged to recognize the candor and forthrightness of both.

The Master had great experience, having commanded merchant ships since 1916, through one war and part of another. Crenshaw also had great experience and it may be noted that he commanded submarines during World War I and convoys in World War II. Storey, on the other hand, while no doubt competent to testify, had not actively navigated for fifteen years prior to his appearance here. Cross had great experience and actively navigated until the beginning of the war.

Experience is a particularly important, and often decisive factor when navigation is by dead reckoning. The Master took into consideration the wind, current, and tide, but from his observations concluded that they would not materially affect his course. When he determined that he was inside his anticipated course, he still had approximately three to four miles of sufficiently deep water to the west. He did not anticipate, from the weather indications or the condition of the sea, any force strong enough to move him into dangerous waters. In view of his testimony, and that of Crenshaw's, it cannot be said that he was negligent.

In dense fog, when navigating on soundings, there is, as practically all agreed, nothing to take the place of experience in estimating the presence and force of the current, other than results of soundings over a period of time. The Master sailed according to his experience. I am of the opinion that if the indications were as he stated, and I have no reason to doubt that they were, then he did not act outside his discretion.

The accusations of negligence in failing to use the larger scale charts, Nos. 1220 and 1219, in failing to stream a patent log, and in using the lead instead of the sounding machine, in the opinion of the court, are without merit. What is to be done depends greatly upon the preference and experience of the navigator. Unquestionably the chart used by the Master, No. 1109, was accurate and was designed for use in the waters in which he was navigating. Both he and Crenshaw stated that they had used it in that area before. Cross and Storey said they preferred the larger scale charts.[1] I do not believe it would have made any material difference whichever would have been used. The same may be said of the Master's failure to use the patent log; indeed, hindsight shows that the Master had approximated his vessel's speed quite accurately. Insofar as the lead is concerned, in shallower waters the lead is frequently used, and in the hands of an experienced leadsman will furnish quite accurate soundings. The Chief Mate on the "E. H. Blum" was an experienced leadsman. I think it is also clear that the "slow" speed of the vessel was not excessive for the taking of soundings in those waters. The preference of the Master based on his experience, and that of Crenshaw, is understandable and within the bounds of reasonable discretion.

Finally, it may be said that the record completely supports the courses plotted by the Master, destined to take him as quickly as possible into shallower waters and then up the coast to his anchorage: it does not reveal error, much less negligent error.

Close examination of the record and the exhibits, however, suggests that the Master probably erred in failing to heave the lead more frequently in the hour before stranding. It will be recalled that during that hour the vessel was on slow speed; consequently, the lead could have been cast one or two more times without interfering with the approved time schedule. Crenshaw stated that soundings would not have in fact advised the Master of the shoal on which he stranded in sufficient time to avert the disaster because that particular shoal rose suddenly and sharply like a knoll. The charts bear this out. Nevertheless the soundings might have been of value as an indication that the vessel was somewhat more to the west than the Master believed.

---

[1] Chart 1220 does not show Overfalls, but stops just above Fenwick Island Shoal; Chart 1219 does not join Chart 1220 directly, but overlaps. It may also be noted that Chart 1109 does not indicate the use of Chart 1220 until well into the shoreward and of Chart 1219 until just above Overfalls.

The instant case is not comparable to that of The Nicanor, C.C.N.Y.1890, 44 F. 504, wherein the Master failed to take any soundings and, in fact, navigated blindly without even the indications such as the Master in this case had that he was on a proper and safe course.

■ The basis of the libellant's claim of full hire lies in the proviso and subsection (i) of Clause 4, already quoted. The libellant construes this particular provision as permitting the recovery of full hire regardless of the negligence of the Master if the stranding was contributed to by any of the enumerated factors listed in subsection (i). I am of the opinion that that construction is a proper one. If there were not present an event listed under 4(a) in addition to assumed neglect of duty of the Master, it would be clear that the proviso would not be applicable. But here, there was such an event. The proviso permits full recovery of hire if the event was brought about by the contribution of any of the listed factors. There can be no question that it is not inconsistent to have several contributing factors participate in a particular result, and if negligence of the Master be assumed, it is nevertheless possible that the stranding may have been contributed to by any of those items listed in the proviso.

Accordingly, whether or not the Master was negligent, the question raised by the libellant with respect to the presence of those items listed in the proviso of Clause 4 must be met. Essentially, two questions are submitted, one whether any factor listed in the proviso was present and two, whether it contributed to the disaster.

The arguments on this score by the libellant are (1) the accident was "caused or contributed to by war or warlike acts" in that (a) the Master was deprived of the use of several radio beacon stations which, if they had not been removed because of the war would have permitted him to ascertain his position with relative accuracy, (b) because of the war he was deprived of the use of his radio, by means of which he could have used the radio compass stations to obtain his position accurately, and (c) the submarine menace caused him to navigate close to shore and thus enhanced the possibility of stranding; (2) the "E. H.

Blum" was in convoy and was separated from the convoy without being given her position; and (3) the "E. H. Blum" was required to navigate contrary to peacetime custom in unbuoyed waters under direction of the naval authorities, in that she was detached from the convoy far to the seaward of the customary lanes followed by merchant vessels and in waters unmarked by any aids to navigation. It is suggested that the naval authorities ought to have anticipated that when they detached the "E. H. Blum" from the convoy, in foggy weather, her Master, having been deprived of peacetime aids to navigation and being in unusual waters might lose his way and might strand.

■ To reach the main issue quickly, it may be said that it is the opinion of the Court that the suggestion last referred to is without merit. The third point also presses too hard on credulity: "unbuoyed waters" cannot be construed, except as a misconstruction, to include waters in which the vessel does not have recourse to radio aids. Moreover, the "E. H. Blum" was not under the direction of the naval authorities at any time after leaving the convoy insofar as her navigation was concerned: the Master was not even directed as to how he was to reach his destination. The second point merits even less attention, since the Master testified that he was in as good a position as the convoy commander at the time of his separation from the convoy, to determine his whereabouts. The fact that the "E. H. Blum" was in a convoy certainly had little to do with the stranding, for agreeing that the separation left the vessel to the seaward of the customary merchant vessel lanes of traffic, nevertheless, the Master had succeeded in safely reaching the customary lanes.

■ The libellant's first point is the critical one. I think it is only necessary to consider the deprivation of the radio beacon stations to reach the controlling result here.

While it is true that the signals rendered by the radio beacon stations are subject to error, there is no doubt on the record, it being agreed even by the respondent's experts, that the radio beacon stations are of vital importance and use to navigators in fog. It was stated that these are merely aids to

navigation and that while their absence makes navigation more difficult they are not indispensable. The theory, apparently, is that radio beacons are comparatively new (being first used about the time of World War 1) and navigators have since time immemorial navigated without them. 1 think the argument misses the point. Had the Master available to him at least another radio beacon station he could have ascertained his position with sufficient accuracy to enable him to avoid stranding. In this manner, the deprivation of such aid contributed to the accident. Certainly if the aids had been there and the Master had not used them, he would have been guilty of neglect of duty.

It is asserted that the Master could have used Cape Henry, but he tried only once when he was not successful because of static. But the charts disclose that at the time he needed the radio aid most, Cape Henry[2] would not have served because the angle was not sharp enough to obtain a usable cross bearing. He could also have taken a two-point bearing on Overfalls, but that would have taken him out of his course, delayed him substantially, and subjected him, earlier, to the submarine menace and, later, to the danger of collision with other vessels, particularly just before the stranding.

The final and most important question is whether the deprivation of the radio aid comes within any of the enumerated items in the proviso. The only classification that it could reasonably come within is "war or warlike acts."

Respondent advocates a construction of this phrase similar to that accorded by the courts to the phrase "consequences of hostilities or warlike operations" generally in use in marine insurance policies. Support is gained from an analysis of the remaining enumerated factors listed in the proviso of (i), which are coincident with the cases construing those factors as outside the scope of "consequences of warlike operations." Cf. Morgan v. United States, 1872, 14 Wall. 531, 20 L.Ed. 738; Queens Ins. Co. of America v. Globe & Rutgers Fire Ins. Co. (The Napoli), 1924, 263 U.S. 487, 44 S.Ct. 175, 68 L.Ed. 402, 1924 A.M.C. 107; Ionides v. Universal Marine Ins. Co., (1863) 14 C.B. (N.S.) 259; The Larchgrove (1919) K.B. 498; and similar cases cited in Crist v. United States War Shipping Administration, 3 Cir., 1947, 163 F.2d 145. The theory is that if "war or warlike acts" were not to be construed as identical with "consequences of warlike operations," there was no necessity for listing the additional factors in (i), and that those factors were listed specifically because the United States wished to afford additional protection to merchant vessel owners; accordingly, the concept of inclusio unius est exclusio alterius should be applied here.

The libellant's reply is simply that if the effect of the words "consequences of warlike operations" was desired, those words could have been, and should have been, used to avoid all doubt. Because they were not used, the Court is at liberty to apply such construction as it deems proper. It may be pointed out, too, that under Clause 20 of Part II of the charter party herein involved, the charterer agreed to provide all war risk insurance. It can well be argued that if (i) of Clause 4 were meant to coincide identically with the common understanding of "war risk" as assumed by the cases, that would have been made clear.

I think, however, some help may be gained from the Ionides case, cited above, which the respondent urges upon the court in support of its position. That case, contrary to the interpretation placed upon it by the respondent, holds that the extinguishing of a lighthouse was a warlike act. The Court there, however, determined that the warlike act was not the proximate cause of the loss. So it was thought by the learned Lords in Yorkshire Dale Steamship Co.,

---

2 The evidence of the case shows that in 1946 Cape Henry was a Class A station, range 200 miles. The parties have stipulated that either may quote from H.O. 205, Radio Aids to Navigation, 1942. The libellant has quoted that publication as showing the power of Cape Henry in 1942 to have been low, range 20 miles. The respondent has not contradicted. There was evidence that a vessel in the convoy had heard Cape Henry, but there is a substantial difference between hearing the signal and obtaining a usable signal.

Ltd. v. Minister of War Transport (The Coxwold), (1942) A.C. 691, particularly at page 715. As Lord Wright pointed out, page 706, "The extinction of the light was not the cause, though there was a *remote* chance that if it had been alight, as in peace time it used to be, the stranding might have been averted."[3]

I think it patent that the distinction between the cases which involved the stranded war risk phrase and the instant case lies in the fact that in the former the aim of the Court was always to determine the "proximate cause" of the loss in controversy. In the case at bar, by the very terms of the charter party it is sufficient if the "warlike act" merely *"contributed to"* the loss. This observation renders it unnecessary to delve more deeply into the cases of the first class referred to.

Accordingly, it is the conclusion of this Court that the reduction in radio aids was a direct incident to the conduct of the war by the United States—a naval strategy to deprive enemy vessels, submarine and surface, from utilizing the radio beacons to ascertain their own position for offensive purposes and to avoid their own stranding in the shoals abounding in the area.

In this respect my conclusion is in accord with that of the Court in the Ionides case which, as previously stated, held the extinguishing of a lighthouse to be a warlike act. Said the Court in the Ionides case, page 284:

"The extinguishment of the light was undoubtedly an act of hostility on the part of the confederates towards the federals."

It is my further conclusion that the reduction in radio aids "contributed" to the stranding of the "E. H. Blum" and her resultant inability to continue in service during the period required to make the repairs necessitated by the disaster.

Finally, as to respondent's remaining point, the record clearly discloses that the owners did not fail to exercise due diligence to keep the vessel working, nor did any alleged unseaworthiness of the vessel play any part in bringing about the stranding.

Accordingly, I state the following

Conclusions of Law.

1. This Court has jurisdiction over the subject matter and the parties.

2. The stranding of the "E. H. Blum" was not brought about by neglect of duty on the part of the Master.

3. The reduction in aids to navigation was a warlike act and such act contributed to the stranding of the "E. H. Blum."

4. The libellant herein is entitled to recover full hire for the "E. H. Blum" to the extent that it was prevented from working by the aforesaid stranding.

An Order may be entered in accordance herewith and the cause will be submitted to a Commissioner for the determination of hire due the libellant, with credit to the respondent for the amounts heretofore paid.