## REYBOLD *v.* UNITED STATES.

The government chartered a vessel during the war of the rebellion; the owners agreeing to keep her "tight, stanch, strong, well-manned," &c., and to bear the marine risks; the war risks to be borne by the government. The vessel was to proceed, " with the *first good opportunity,* to such ports and places as ordered and directed by the quartermaster of the government." On the 20th January, 1865, the vessel being then in the Potomac at Washington, and the navigation considerably obstructed by ice, the quartermaster consulted her captain about her condition and capacity, and was informed that she was sheathed with iron, and was of capacity to take a certain number of men and horses, which the government wanted to transport. The quartermaster then ordered the captain to receive the men and horses, and to proceed on the next morning down the river to City Point. The captain made no objection to the order, because, as he testified, " he considered it imperative as a military order, and as such obeyed it; though if he had considered that he could have used his judgment he would not have left the wharf, as he did not con-

sider it safe." Having accordingly received the men and horses he set off. In going down the river the vessel, though "tight, stanch, strong, well-manned, &c.," was wrecked by the ice. *Held*, that the risk was a marine risk—not one of war; and that though the acquiescence of the master deprived the act of the quartermaster of being a tortious act, no recovery could be had in the Court of Claims.

APPEAL from the Court of Claims; the case being thus:

Reybold, owner of the steamer Express, chartered her to the government under a charter-party, whereby it was agreed

" That the vessel now is and shall be kept and maintained tight, stanch, strong, and well and sufficiently manned, victualled, tackled, apparelled, and ballasted, and furnished in every respect fit for merchant service at the cost and charge of her owner. And when laden shall proceed, *with the first good opportunity*, to such ports and places as ordered and directed by the quartermaster of the United States.

" The war risks to be borne by the United States; the marine risks to be borne by the owner."

On the 20th and 21st of January, 1865, the vessel was at Washington; the Potomac River being then frozen over from bank to bank; the ice eight inches thick; and the channel alone, in which, nevertheless, masses of ice were floating, kept open by the current and by the passage of vessels. In consequence of this condition of the river, the navigation was suspended except by government steamers and the ferry-boats. On the 20th of January, the master received an order from the quartermaster to take certain men and horses on board and proceed " to-morrow morning " to a place called City Point.

Previous to giving this order, the quartermaster, in answer to his inquiries, was informed that the vessel was sheathed with iron, and was of *capacity* to take the men, horses, &c., by the captain, who made no objection to the order, because, as he testified, " he considered it imperative as a military order, and as such obeyed it; though if he had considered he could have used his judgment, he would not have left the wharf, as he did not consider it safe."

Having taken the men and horses on board on the 20th, he set off on the following morning for City Point.

While the vessel was crossing the river, her hull was crushed by heavy cakes of ice, and she filled and sank. The injury in sinking did not arise from any defect in the vessel or any fault on the part of her officers or crew. The Court of Claims found as conclusions of law :

1. That the peril was within the term "marine risks," and therefore to be borne by the owner.

2. That the charter-party placed the steamer in the military service of the United States in a time of war, and that the term was to be construed in reference to that service, and included risks from perils of the sea and seasons incident to that service, and its exigencies.

3. That the steamer, being in the military service, was subject to military orders necessary for the proper performance of the service.

It accordingly gave its decree for the United States. And from that decree the owner of the vessel appealed.

*Mr. E. Fitch, for the appellant :* .

The master and crew were the servants of the owners, who appointed, paid, and subsisted them; and under a right interpretation of the charter-party, the master was to see to and control the navigation of the vessel and direct her motions. The quartermaster could indeed order and direct the freight to be carried and the ports and places at which it should be delivered; in other words, control the destination and employment of the vessel. But the owners maintained the right to say what was the right mode of her navigation.

Now, whether the state of the weather and the condition of the water are suitable for the commencement of the voyage, it appertains to the office of master of the vessel to determine. "The master must commence his voyage without delay as soon as the weather is favorable. . . . *But he must on no account sail out during tempestuous weather.*" So say all the codes. Indeed, by most of the ancient marine ordinances the master is required before he hoists sail to consult his

mate, pilot, and others of the crew, as to the wind. and weather. But by the law of England, or by our law, the entire management of the ship is intrusted to the master.*

In the present case the order of the quartermaster deprived the master of the steamer of the right to judge whether the " good opportunity " mentioned in the charter-party existed. It defined and specified the time for the commencement of the voyage. " *To-morrow morning* " was the point of time named for the departure of the vessel; without regard to the state of the weather or the condition of the river. The departure of the vessel at that time, in face of apparent danger, was an unskilful and negligent act of navigation, for which the United States and not the owners are responsible.

The order of the quartermaster was a military order, issued by a military officer of the United States " acting in discharge of his official duty " in time of war. Obedience to it could not be refused.†

But the United States are estopped from alleging that the master should not have obeyed it. They cannot be permitted to complain because the master did what they, by their duly authorized agent, commanded him to do. His act was their act, for he was acting within the scope of his authority. Nor can the fact, that the master obeyed without objection, relieve them from the responsibility of the order and its consequence. To object was no part of his duty.

It cannot be said that the master acquiesced, in the proper sense of the word, in the order given. His opinion was not asked, nor was he consulted in regard to the dangers to be encountered in making the voyage. He was asked in regard to the *condition* and *capacity* of his vessel, and to these inquiries he made true answers. But the voyage was not made the subject of negotiation or consultation between him and the quartermaster. The order was given, and received and

* Abbott on Shipping, Part 4, chapter 5, page 351 (original), and cases and ordinances cited in note thereto.

† The Venice, 2 Wallace, 276.

obeyed, as a military order simply, imperative in its terms and admitting no question.

By the term " marine risk," as used in the charter-party, was evidently intended such risk from marine dangers and perils as the vessel would be subjected to while making her voyages under and in pursuance of the contract; that is, while controlled and navigated by the master and crew chosen by the owners. It was not intended that the United States could substitute some other person, by them chosen, in place of the master, and still continue the responsibility for the marine risk upon the owners. Nor was it intended that they could override the judgment of the master by military command, and cast upon the owners the risk from marine perils thereby incurred.

*Mr. G. H. Williams, Attorney-General, and Mr. C. H. Hill, Assistant Attorney-General, contra.*

Mr. Justice DAVIS delivered the opinion of the court.

This case is in only one particular different from that of *Morgan* v. *United States*, decided at the last term.* Both were contracts of affreightment, with stipulations that the United States should bear the war risk and the owners the marine risk. The hiring in each case was for a particular purpose, the transportation of troops and munitions of war from place to place, as the necessities of the service might require; and although the United States were empowered to direct the manner of loading the vessels and their points of destination, yet the owners retained the control and management of them, and agreed to keep them in good repair and fit for the service in which they were engaged. In each case the loss sued for was occasioned by the perils of the sea, and in both the effort has been, notwithstanding the express terms of the contract that the owners were their own insurers against such risks, to shift the responsibility upon the United States.

* 14 Wallace, 531.

It was insisted in Morgan's case that the owners were relieved and the government chargeable, because the master was compelled to proceed to sea by the peremptory order of the quartermaster, when, in his judgment, expressed to that officer, the state of the wind and tide rendered it hazardous to do so, but we held, as in several previous cases,* that if this were so, it was outside of the contract—a tortious act of the officer—and, therefore, not within the jurisdiction of the Court of Claims.

In the present case the master made no objection to the order requiring him to proceed on his voyage, and this constitutes the only difference between the two cases. This difference, however, instead of helping the cause of the claimant, makes the justice of the defence still clearer. It was the business of the master to know whether the navigation of the river was dangerous or not, and naturally, he would be better informed on such a subject than a quartermaster of the United States. How are we to know, in the absence of proof, that the order would have been given, or, if given, not withdrawn, had the master stated that in his opinion, in the state of the river, it was unsafe to attempt to make the voyage? Why not speak of the danger when he told the quartermaster, in reply to an inquiry on the subject, prior to the order being given, that his vessel was sheathed with iron and had capacity to take the men and horses to City Point? This was the time to have spoken, as the object of the inquiry was plainly to ascertain whether or not the boat, if she had the requisite capacity, was in a condition to withstand the masses of ice which were floating in the channel of the river. It is very clear that, upon the information which was given, in the absence of any objection to the proposed voyage, the officer of the government had the right to suppose, in the judgment of the master, it could be safely undertaken. It is no excuse to say that the master at the time knew it was unsafe to leave the wharf, but said nothing,

---

* Reed v. United States, 11 Wallace, 591; United States v. Kimbal, 13 Id. 636.

because he considered the order a military one, and as such to be obeyed. It is true, by the terms of the contract of affreightment, he was subject to the orders of the quartermaster, but this contract did not require him to sail out of port during such tempestuous weather as would necessarily jeopardize the safety of his boat.

If obedience to an order given under such circumstances had been demanded, after proper objection, it would have been a tortious act on the part of an officer of the government.

In such a case, if relief is to be afforded, it must come from Congress, for the Court of Claims has no power to entertain a suit based on a consideration of this character.

If, however, the master chose to obey the order without objection, and in the course of the voyage the steamer commanded by him is lost or injured by a peril of the sea, her owners can have no just cause of complaint against the government, and must abide the consequences of their stipulation.

In every aspect of the case the judgment of the Court of Claims should be

AFFIRMED.