**UNITED STATES v. STANDARD OIL CO. OF NEW JERSEY.**

**STANDARD OIL CO. OF NEW JERSEY v. UNITED STATES.**

**THE YMS-12.**

**THE JOHN WORTHINGTON.**

Nos. 76, 77, Dockets 21441, 21442.

United States Court of Appeals
Second Circuit.

Argued Nov. 11, 1949.

Decided Dec. 15, 1949.

Edward L. Smith, of New York City (Irving H. Saypol, U. S. Atty., of New York City, on the brief), for appellant.

Edwin S. Murphy, of New York City (Kirlin, Campbell, Hickox & Keating, Raymond T. Greene, and Helen C. Cunningham, all of New York City, on the brief), for appellee.

Before AUGUSTUS N. HAND, CHASE, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

The interesting question presented in this case is whether damage from a collision of an oil tanker with a mine-sweeper at work in the swept channel off New York harbor on December 16, 1940, was covered by special "war risk" or ordinary marine insurance, when the collision was due to the faulty navigation of the two vessels.

The vessels involved in the collision were the United States Navy Ship YMS-12 and the steam tanker John Worthington; it occurred at sea in a buoyed channel in the approaches to the New York harbor. At the time of the collision the YMS-12 was one of a three-ship formation proceeding seaward with mine sweeping gear streamed sweeping the buoyed channel. The John Worthington was outbound from New York in ballast, and was proceeding to sea in convoy. Both ships displayed regular and proper running lights, and in addition the YMS-12 was displaying three all-round green lights to indicate that it was a mine sweeping vessel towing mine sweeps. The weather was clear and the visibility was good.

The district court has found, pursuant to a stipulation of the parties, that "the aforesaid collision was contributed to both by fault in the navigation of S.S. John Worthington and fault in the navigation of the United States Ship YMS-12, consisting of failures on the part of both vessels to comply with the applicable rules for the prevention of collisions and the requirements of good seamanship under the circumstances." Only the YMS-12 was damaged as a result of the collision.

The John Worthington, owned and operated by the Standard Oil Company of New Jersey, was on a time charter to the United States Government. The charter party provided that the United States was to furnish "a standard hull war risk policy of the War Shipping Administration" and Standard was to assume or insure against all other risks. Thus Standard took out a normal marine hull policy which contained an F. C. & S. clause, excluding from its coverage war risks. Some twenty-two risks were defined by the parties as "war risks," including the important exclusion of "loss, damage, or expense caused by or resulting from * * * all consequences.

of hostilities or warlike operations."[1] Under the "war risk" endorsement attached to that marine hull policy the United States assumed "only those risks which would be covered by the attached policy (including the Collision Clause) in the absence of the F. C. & S. warranty contained therein but which are excluded by that warranty."

Since both ships were at fault, the United States of America would normally be entitled to recover from Standard for half of the damage suffered by the YMS-12; and it filed its libel below asking for such recovery. But Standard maintains that this was a "consequence of hostilities" insured against by the government, and has brought a cross-libel to recover from the government as war risk insurer the amount for which it is liable to the government as owner of the YMS-12. The two libels have been consolidated for the purposes of trial and appeal. The district court, in a reasoned opinion by Ryan, J., 81 F.Supp. 183, held that the collision did come within the war risk insurance and held in favor of Standard.[2] From that holding the government appeals.

The United States began to assume the war risks of merchant vessels at the time of the Civil War, and that conflict produced much litigation in our courts as to what constituted a war risk. Since that period, however, the question has arisen but infrequently in this country. The situation is otherwise in Great Britain, where half a dozen times in the last thirty years the House of Lords has been concerned with the meaning of just such a clause as that involved here.

Although it is not always easy to reconcile the diverse language of the many cases in both countries on this question, the principle which may properly be drawn from them is that a loss will be held to be a "consequence of hostilities" and to come within the limits of war risk insurance where one of the vessels party to the loss is both engaged in a warlike operation and so navigating as a result of the war that it creates a peril. To put it another way, not only must the vessel's mission be one of war, but the warlike character of its operation must be the dominant and effective cause of the resulting catastrophe.

Thus this principle affords the justification for a group of cases in which a vessel was so navigating because of the war as to create a peril, but was not on a mission of war; and the loss was held to be a marine risk, rather than a war risk. It explains the result in the companion cases of Britain Steamship Co. Ltd. v. The King (The Petersham) and Green v. British India Steam Navigation Co. Ltd. (The Matiana), [1921] 1 A.C. 99. The Petersham collided with another ship while both were sailing without lights in accordance with admiralty rules. The Matiana stranded on a reef while sailing under convoy and zigzagging. Both accidents were held to be not the consequence of hostilities, since the vessels were carrying nonwar cargoes and were not bound for war bases. The same principle was involved in the leading American case of Queen Ins. Co. of America v. Globe & Rutgers Fire Ins. Co. (The Napoli), 263 U.S. 487, 44 S.Ct. 175, 68 L.Ed. 402. The Napoli collided with another ship while both were sailing without lights and under convoy. Even though it carried some war materials it was held not to have been engaged in a warlike operation, and thus the loss was not a war risk. In accord is a decision of Judge Bright in Nordling v. Gibbon, D. C. S. D.

1. Appellee has suggested that this language provides a broader coverage than "war risk," thus leading to the argument that the earlier American cases dealing with war risk insurance are not controlling. But the parties here showed a different view in their twenty-two clauses defining a war risk—insurance for this being the form of insurance required of the government under its charter obligation—and demonstrating that "consequence of hostilities" was only one component, of many, of war risk; and we see nothing in the earlier cases or here to indicate that this conception is other than the natural and usually understood one.

2. The report of the decision in D.C., 81 F.Supp. 183 contains a full statement of the facts and extracts from the insurance contract in issue; reference to it is assumed hereinafter.

N. Y., 62 F.Supp. 932. There the collision was the result of the joint negligence of two ships blacked out under Navy orders, but the insured ship was neither a warship nor bound for a war base, and its cargo, though intended for manufacture of war materials, was not capable of use for war in its then form. Hence its operation was not warlike, and the accident was not the result of warlike operations.

In other cases a loss has been held to be a marine risk, even though a ship was involved in warlike operations, where the loss was not caused by navigation because of the war. This was the result in Clan Line Steamers Ltd. v. Board of Trade (The Clan Matheson), [1929] A. C. 514. The Clan Matheson, proceeding in a convoy at night without lights, was hit and sunk by a warship admittedly engaged in warlike operations. But it was hit because its steering gear had broken, causing it to drift across the course of the warship; and hence the breakdown of the gear, rather than the collision with the warship, was the dominant and effective cause resulting in the loss of the ship. A similar rule governed in Liverpool and London War Risks Ass'n Ltd. v. Ocean Steamship Co. Ltd. (The Priam), [1948] A.C. 243. The Priam, carrying war materials across the ocean and thus admittedly engaged in a warlike operation, ran into heavy weather which caused considerable damage. Some of the damage was attributable to war materials and armament carried on deck in a manner which would never have been countenanced save for the exigencies of war. This damage was said to be the result of a specific and special war peril, and the war risk underwriters were held responsible. But other damage which would have occurred solely because of the weather, regardless of the special arrangements for cargo handling necessitated by the war, was charged to the underwriters of the normal marine risk insurance.

There have been, of course, many cases in which both of the necessary elements were present, and in which the war risk underwriters were made to bear the loss. Attorney General v. Ard Coasters Ltd. (The Ardgantock), [1921] 2 A.C. 141, involved a collision between a merchant vessel and a destroyer on patrol duty in the North Sea. Neither vessel was negligent, but both were sailing without lights and the collision was caused by the course required by the destroyer's patrol duties. Liverpool & London War Risks Insurance Ass'n Ltd. v. Marine Underwriters (The Richard de Larrinaga), [1921] 2 A.C. 141, concerned a collision between a merchant vessel in convoy and a warship en route to take up escort duties. Again both vessels were unlighted because of the submarine danger, and neither was negligent. The transport by sea of war material in time of war from one war base to another was held to be a warlike operation in Commonwealth Shipping Representative v. Peninsular and Oriental Branch Service (The Geelong), [1923] A.C. 191; where two ships thus occupied collided, without negligence, and navigating without lights, the loss was held a consequence of hostilities. The most recent and most widely discussed of this group of cases is Yorkshire Dale Steamship Co. Ltd. v. Minister of War Transport (The Coxwold), [1942] A.C. 691. There a ship, admittedly engaged in a warlike operation, stranded. Although an unexpected tide set was a complicating factor, the dominant and effective cause which set the vessel on the rocks was a deviation of course it had made under naval orders to avoid submarine attack. The loss was held to have been a war risk.

There are two other cases which properly belong in this final category, but which have employed language so strong that some authorities have regarded them as stating a different rule from that which we have drawn from the cases. Attorney General v. Adelaide Steamship Co. Ltd. (The Warilda), [1923] A.C. 292, involved a collision between a hospital ship evacuating wounded troops from France, blacked out, and another ship which was displaying dimmed side lights. On these facts it would seem a simple case of a vessel both engaged in a warlike operation and so navigating as a result of the war that it creates a peril; thus the loss would properly be a consequence of hostilities. But the difference in this case was that the Warilda

was held to have been negligent; and it was argued that the real cause of the collision was negligence, a marine risk, rather than the war risks incurred by sailing without lights. The House of Lords held that the dominant and effective cause of the collision was the warlike operation, but went on to use very strong language which might seem to negative negligence as an intervening factor taking a loss out of the category of "consequences of hostilities." Thus Lord Shaw of Dunfermline said, at 300: " * * * when a ship requisitioned by the naval authorities and actually engaged in what I have explained to be a warlike operation comes into collision with another vessel under, of course, the exceptional conditions of speed, with lights doused and other such warlike precautions, the category of war risk cannot be changed into the category of sea risk by reason of the negligence of those engaged in conducting those operations. The conduct may have been faulty, but it was a warlike operation although faultily conducted. Faulty navigation on the part of one ship or the other is, of course, the determining factor of responsibility as between the two ships, but, in my opinion, it is not a legitimate factor for the other purpose which is here attempted—namely, of converting a war risk into a sea risk. Once the category of warlike operations attaches to the movements of the vessel, that category must continue to attach, although those movements had an element of negligence in their operations."

The other of these cases is Board of Trade v. Hain Steamship Co. Ltd. (The Roanoke-Trevanion), [1929] A.C. 534. There a merchantman collided with a Navy mine planter. The collision was due to negligence by both vessels, but this was held to be immaterial and the loss was judged a consequence of hostilities.

In his summary of the principles of British law on this subject in The Coxwold, supra, [1942] A.C. 691, at 716, Lord Porter read the two cases just discussed as laying down the following rules: " (8). If the collision be caused both by the ship so engaged [on a warlike operation] and by one not so engaged so that both were effective causes of the disaster the consequent loss is due to the warlike operation: The Roanoke-Trevanion. (9). The collision, if due in whole or in part to the action of the ship engaged in a warlike operation, does not cease to be caused by the warlike operation by reason of the fact that that action is negligent: The Warilda." Some text writers have gone even further and have found in these cases an "unexpressed premise that the war risk insurer is liable ipso facto for all accidents to ships in what might, for any technical reason, be denominated war service." Note, Allocation of Risk Between Marine and War Insurer, 51 Yale L. J. 674, 679; and see also Derby, What Are Warlike Operations Under F. C. & S. Clause in Marine Policies, 33 Calif.L.Rev. 128.

■ If the Warilda and Roanoke-Trevanion cases really carry British law thus far, we are necessarily compelled to refuse to follow them. For such an extreme rule would conflict hopelessly with a long line of American decisions. These decisions emphasize that it is not enough that a vessel merely be engaged in warlike operations, but the dominant and effective cause of the loss must be the warlike character of the operation. Where a vessel engaged in a warlike operation suffers damage because of a peril common to war vessels and non-war vessels alike, the marine underwriters, rather than the war risk underwriters, will be held liable. The leading American decision is Morgan v. United States, 14 Wall. 531, 20 L.Ed. 738, where damage to a ship resulting from stranding on a sand bar while under orders of a government pilot and in the process of carrying urgent munitions and men was held a marine, rather than a war, risk. The Court said, at page 535: "That the high wind and low stage of water were the efficient agents in producing this disaster are too plain for controversy. They were the proximate causes of it, and in obedience to the rule 'Causa proxima non remota spectatur,' we cannot proceed further in order to find out whether the fact of war did not create the exigency which compelled the employment of the vessel."

In accordance with the rule there laid down, the following were held to be marine, rather than war, risks: injury to a troop transport from drifting ice when army orders compelled the voyage, even though ice conditions made navigation unsafe, Reybold v. United States, 15 Wall. 202, 21 L.Ed. 57; damage from a leak sprung while the vessel was carrying military stores, Goodwin v. United States, 17 Wall. 515, 21 L.Ed. 669; a stranding caused by the vessel's negligence in course of maneuvering to land troops in theatre of active operation, White v. United States, 154 U.S. 661, 14 S.Ct. 1192, 26 L.Ed. 178; a collision with a drifting derelict while the vessel was proceeding at full speed through dense fog pursuant to urgent military orders, Mott v. United States, 9 Ct. Cl. 257; the striking of a submerged anchor in the course of voyage to supply troops in the field, Leary v. United States, 14 Wall. 607, 20 L.Ed. 756; a collision, stranding and bumping while the vessel was carrying men and horses to theatre of operations, New Orleans-Belize Royal Mail and Central American Steamship Co. Ltd. v. United States, 239 U.S. 202, 36 S.Ct. 76, 60 L.Ed. 227.

Our own court has emphasized that the proximate cause of a loss must have been warlike in order to make the loss a war risk. Reinold v. United States, 2 Cir., 167 F.2d 556, certiorari denied 335 U.S. 824, 69 S.Ct. 48, holding that the shooting of an officer of an armed merchant vessel by a drunken guard was not within a war risk life policy. And search for the "cause nearest the loss" has been the basis for the determination of liability under analogous circumstances in many other cases. The Napoli, supra; Crist v. United States War Shipping Administration, 3 Cir., 163 F.2d 145, certiorari denied 332 U.S. 852, 68 S.Ct. 352, 92 L.Ed. 422; Dennehy v. United States, D.C.S.D.N.Y., 15 F.2d 196; Standard Oil Co. of New Jersey v. St. Paul Fire & Marine Ins. Co., D.C.S.D.N.Y., 59 F.Supp. 470. Thus we believe a correct statement of the American rule to be that under a policy which expressly insures against war risks or "all consequences of hostilities or warlike operations," the coverage extends only to perils due directly to some hostile action, military maneuver, or operational war danger, and does not include the aggravation or increase of a maritime risk because of war operations. 45 C.J.S., Insurance, § 863.

If we were to follow the supposed British rule that any loss occurring to a vessel engaged in a warlike operation is a consequence of hostilities, there would be no point in the taking out of marine insurance by ships devoted to missions of war, since the war risk insurance provided by the government would cover any losses they might incur. But the contrary is of course the practical course followed. The very charter party involved in this case refutes the theory by its insistence that Standard either assume or insure all normal marine risks which the John Worthington would incur while engaged by the government. Clearly it was not the intention of the parties that the war risk insurance should provide complete coverage for the vessel. And our conclusion is supported by the fact that marine insurance did not become superfluous during the war, but actually the marine insurers added a special wartime surcharge to their premium rates because of the increased navigation perils which would be met by vessels while on warlike operations. Note, 51 Yale L.J. 674, 679, n. 42.

It is urged, however, that we should decide these cases by a mechanical application of the British holdings because of the so-called "rule of conformity." This "rule" springs from a dictum of Justice Holmes in The Napoli, supra, 263 U.S. 487, at page 493, 44 S.Ct. 175, at page 176, 68 L.Ed. 402, where he said: "There are special reasons for keeping in harmony with the marine insurance laws of England, the great field of this business." It was the basis of the decision in Link v. General Ins. Co. of America (The Roustabout), D.C.W.D.Wash., 56 F.Supp. 275, 276, where the court said: "* * * if there is an authoritative English decision on the facts of the case in question that decision concludes the matter." In that case a merchant ship collided with a Navy oiler

carrying naval supplies. Although both vessels were at fault, the negligence of the oiler was held to be the proximate cause of the collision. But the court regarded negligence as immaterial, on the basis of The Warilda and The Roanoke-Trevanion, both supra, and held that the collision was a consequence of hostilities covered by the war risk insurance. This holding was affirmed, with the Court of Appeals citing the Holmes dictum. General Ins. Co. of America v. Link, 9 Cir., 173 F.2d 955, 956.

We do not read Justice Holmes' statement as requiring conformity with the British decisions when the American rule is different. Further, such a rule at best had its basis entirely in business expediency, and should not go beyond that. Here all demands of business expediency must be held to have ceased because the British underwriters in 1942 changed the form of their F. C. & S. clause and war risk clause to avoid the ambiguities of the language in some of the British decisions by making it clear that not only must the vessel have been engaged in a warlike operation, but the warlike character of the operation must have been the direct and effective cause of loss. 1943 A.M.C. 130.[3] Thus it is no longer necessary to conform to the supposed British rule in order that the same language shall mean the same thing both in America and England. Indeed, the English experience affords a practical demonstration of rejection by the affected business itself of an extreme judicial rule operating supposedly in its favor.

As a matter of fact, the rules set forth by the House of Lords are probably not as much at variance with our rules as has been claimed. Under our own authorities the war risk underwriters must be held liable for the loss of a ship which by faulty navigation has left a swept channel and hit a mine. And if a master negligently fails to black out his vessel, and the lights left on it enable a submarine to torpedo it, there would be little hesitation in calling the loss a consequence of hostilities. But such holdings would be not because any loss incurred by a ship on warlike operations is covered by war risk insurance or because negligence is immaterial in determining whether or not a loss is a consequence of hostilities. Rather it would be because the negligence in the cases we state would not be the dominant and effective cause producing the loss, and under our authorities such cause must be sought.

But the British courts appear ultimately to be concerned with proximate cause just as are we. Thus the Lord Chancellor said in The Coxwold, supra, [1942] A.C. 691, at 696, 697: "Authority is hardly needed for the proposition that you do not prove that an accident is 'the consequence of' a warlike operation merely by showing that it happened 'during' a warlike operation." He then went on to tell the House of Lords that they must search for the "effective and predominant cause of the accident." The Law Lords then proceeded to set out the standards by which one determines proximate cause, and urged that a real, common-sense standard should be used, such as would be employed by the man in the street. It is for its clarification of the rules of causation that The Coxwold, supra, has been so enthusiastically hailed by the periodicals. See Note, 59 L.Q.Rev. 6. To similar effect is the dictum of Lord Wrenbury in The Petersham and The Matiana, supra, [1921] 1 A.C. 99, at 134: "I feel grave difficulty, however, in saying that from the mere fact that a vessel is a vessel of war and is steaming in her duty as such, it results that if she collides with another vessel and

---

3. " * * * but this warranty shall not exclude collision, contact with any fixed or floating object (other than a mine or torpedo), stranding, heavy weather or fire unless caused directly (and independently of the nature of the voyage or service which the vessel concerned or, in the case of a collision, any other vessel involved therein, is performing) by a hostile act by or against a belligerent power." F. C. & S. Clause, 1942, 1943 A.M. C. 130, 131. The learned editors of the work cited point out that this was adopted "to correct and restore the distribution of marine and war risks" as affected by the Coxwold case, but that it does more than neutralize the Coxwold result; it also "sets aside" the result of the Roanoke-Trevanion, Warilda, and other cases cited.

sinks her, the loss is in consequence of a warlike operation."

Applying the principles which we have deduced to the facts of the case before us, we think the result tolerably clear. It is conceded that the YMS-12 was engaged in a warlike operation at the time of the collision. Thus the question which we must decide is whether the warlike operation and the perils to navigation caused thereby was the effective cause of this accident. On facts almost identical to those involved here, a district court has found that the effective cause of the accident was the joint negligence of the merchantman and the Navy vessel, rather than the warlike character of the operation. Meseck Towing Lines, Inc. v. Excess Ins. Co. Ltd., D.C.E. D.N.Y., 77 F.Supp. 790. The court said, 77 F.Supp. at page 793: "In other words, the 'cause nearest to the loss' [citing The Napoli, supra], i. e. the proximate, not the remote cause, must be held to be negligence in navigation in a peaceful harbor. That the vessel in collision with the civilian ship chanced to be a warship constitutes at most a remote but not a proximate cause."

 The burden of proof in cases of this sort is on those who claim that a loss resulted from a war risk, rather than a marine risk. The Priam, supra, [1948] A. C. 243, at 259; The Warilda, supra, [1923] A.C. 292, at 305; The Petersham, supra, [1921] 1 A.C. 99, at 119; 51 Yale L.J. 674, n. 2. The stipulated facts show agreement that the cause of this collision was "failures on the part of both vessels to comply with the applicable rules for the prevention of collisions and the requirements of good seamanship under the circumstances." This finding not only fails to satisfy the burden on Standard to show that the loss was a consequence of hostilities, but rather is a positive indication that the loss was due to the normal marine risk of failure to comply with the applicable rules and the requirements of good seamanship. We cannot agree with appellee's argument that the words "under the circumstances" carry some connotation limiting the otherwise clear force of the words. There is nothing to suggest a strained construction of so fairly simple and indeed ordinary a statement.

Thus the United States may collect from Standard for one-half the damage to the YMS-12, but Standard may not collect the amount of its liability from the United States as its insurer against war risks. In the light of this conclusion it is unnecessary to consider the further difficult question raised by Adelaide Steamship Co. Ltd. v. The Crown (Second Warilda), [1926] A.C. 172, and considered below at pages 191–193 of 81 F.Supp. as to whether the insured under a war risk policy can collect, in addition to his own damage, amounts which he owes to others, even if his liability be considered the result of a war risk.

In the consideration of this interesting case, the court has been greatly aided by the scholarly briefs and effective arguments of counsel. It is a pleasure to record the court's appreciation of the lightening of its load resulting from so able a presentation of the important issues here involved.

Reversed.