## HALIFAX INS. CO. v. MEHDI DILMOG-HANI & CO. et al.

United States District Court
S. D. New York.

March 16, 1950.

Supplemental Opinion June 12, 1950.

Ignatius, McFadden & Catalano, New York City, Edward McFadden, Jr., and William J. Woods, New York City, of counsel, for plaintiff.

Kirlin, Campbell, Hickox & Keating, New York City, David P. Dawson, New York City, of counsel, for defendants.

RYAN, District Judge.

This action at law is brought by the Halifax Insurance Company, a Canadian corporation, to recover for moneys paid on two marine risk insurance policies, which it is claimed were paid under a mistake of fact to defendants Mehdi Dilmoghani & Co. and its wholly-owned subsidiary Kerman Rug Weavers, Inc., New York corporations, for damages to two consignments of Persian rugs.

On November 1, 1941, plaintiff issued two separate open policies to each defendant insuring two shipments of rugs, against marine risks in the amount of $62,050 and against war risks in the amount of $38,303. The rugs were shipped from Bombay, India, aboard the S. S. Exminster which sank with her cargo on April 19, 1942 as a result of a collision with the S. S. Algic off the eastern entrance of the Cape Cod Canal. Payment for the damage to these consignments was made to defendants under the marine risk policies. It is now claimed by plaintiff that payment should have been made in the lesser amount under the war risk policies, and that the payment was made under the marine policies under a mistake of fact. It seeks judgment for the difference between what it actually paid under the marine policies and what it would have been liable to pay under the war risk policies.

The Exminster was proceeding to New York via the Cape Cod Canal after having discharged part of her cargo at Boston. On her arrival off the eastern entrance of the Canal, a pilot boarded her, and since the canal traffic light was against westbound vessels when she arrived, he selected an anchorage, anchored the ship and went ashore. There are no designated anchorages at this entrance of the canal. There is a canal approach lighted bell buoy two and a half miles north, thirty-three degrees true from the entrance. The ship was anchored about eight-tenths of a mile from the entrance and a little easterly of a line from the entrance to this buoy in the ships' fairway. Vessels emerging from the canal and bound for Boston usually pass west of the buoy, while those bound for Halifax or other easterly ports pass a little east of it. Although traffic usually fans out after leaving the canal some go from the canal to the buoy and take their departure from there. (This apparently was what the Algic did.)

On April 19, 1942, at eight p. m. there were approximately thirty-five vessels anchored off the eastern end of the canal waiting for the light to change. The canal was heavily burdened with wartime traffic, since it offers a safer course and is preferred to the more hazardous sailing in open sea around the Cape. The number of vessels waiting passage through the canal and the congestion of the area off its entrance were directly attributable to the war. Some of the vessels thus an-

chored were displaying lights, others were not. The Exminster was blacked out; the Algic was proceeding with lights. The Exminster's routing instructions required her to proceed blacked out except from the eastern entrance of the canal to Hen and Chickens' Light Vessel west of the Canal.

The Algic was proceeding along the inland route from New York to Halifax where she was to join a convoy. Her original ultimate destination was a North Russian port, but after the collision she was diverted to England, where she discharged her cargo and returned then to the United States. A substantial part of her cargo—3289 tons out of 5139—consisted of *lend-lease* materials: food, raw materials, machinery, and manufactured items. It was a general cargo.

She was traveling subject to general naval security regulations, but her captain did testify that she displayed her running lights during all the voyage from New York through the Canal to the place of collision, and that somewhere near Newport she ran her de-gaussing range. He also stated that he had intended to "douse" the running lights when he came to the fairway buoy off the entrance of the Canal. After leaving the Canal, the Algic travelled down the fairway at a low rate of speed—about 3½ knots—until she collided with the blacked-out Exminster some ten minutes later, and abount six minutes after she (the Algic) had discharged her pilot. No signals were exchanged between the ships prior to the collision, but the Algic did reverse her engines about one minute prior to contact. As a result of the collision the Exminster sank.

Following the accident, defendants promptly filed claims under the marine policies for the damage done to the two consignments of rugs. After numerous conferences, Halifax made payment under the marine policies on September 22, 1942 and on February 2, 1943. The payment amounted to $24,779.29 and in addition Halifax withheld $4,000 as a deposit pending the determination and adjustment of salvage charges. In the fall of 1946, plaintiff notified defendants that the claims should have been "cognizable" under the war risk policies, and that since payment had been made under the marine policies defendants had been overpaid, under a mistake of fact.

Plaintiff has the burden of establishing, first, that the Algic was engaged in a warlike operation; second, that the collision was the result of a warlike operation; and third, that payment was made under a mistake of fact.

We may assume *arguendo* that on the foregoing facts the Algic was engaged in a warlike operation at the time of the collision, Commonwealth Shipping Representatives v. Peninsular and Oriental Branch Service (The Geelong), (1923) A.C. 191, but "whether that operation caused the loss is a different matter." Yorkshire Dale Steamship Co., Ltd. v. The Minister of War Transport (The Coxwold), (1942) A. C. 691, 716. "It is an entirely different thing from saying that any and every accident which happens to such a ship during her voyage is the consequence of a warlike operation. * * * Authority is hardly needed for the proposition that you do not prove an accident is 'the consequence of' a warlike operation merely by showing that it happened 'during' a warlike operation." The Coxwold, supra, 697. This is so especially since the coverage of the war risk policy extends "only to perils due directly to some hostile action, military maneuver, or operational war danger, and does not include the aggravation or increase of a maritime risk because of war operations." United States v. Standard Oil Co. of N. J., 2 Cir., 178 F.2d 488, 493.

Plaintiff in an effort to establish that the collision was the result of such an operation submitted the deposition of but one witness, Charles Ellis, a lieutenant in the Coast Guard in charge of the Canal at the time of the accident. Ellis did not testify as to the cause of the collision, but he did state that the congestion off the entrance to the Canal on the day of the accident was the result of war. Assuming that the congested condition compelled the Exminster to anchor in the ships' fairway (and there is no testimony to support this), and giving plaintiff the most favorable construction of the record I cannot say that

the warlike character of the Algic mission and the selection of this anchorage were the dominant and effective causes of the collision. It might well be, and I cannot say otherwise on the record before me, that there were no lookouts on either vessel prior to the mishap and if this be so the collision might not be the result of the warlike operation of the Algic, but very possibly that of faulty navigation. In United States v. Standard Oil Co. of N. J., supra. Judge Clark wrote, "where a vessel engaged in a warlike operation suffers damage because of a peril common to war vessels and non-war vessels alike, the marine underwriters, rather than the war risk underwriters, will be held liable."

 Applying the principles set forth in that case, I find that plaintiff has failed to sustain the burden of proof that the claimed loss resulted from a war risk rather than from a marine risk. It therefore becomes unnecessary to consider whether the moneys were paid to defendant under a mistake of fact.

Judgment is awarded defendant with costs.

### Supplemental Opinion

I omitted in my decision of March 16, 1950 to make findings relative to interest on defendants' counterclaim.

Plaintiff was responsible for general average contributions assessed against defendants' shipment of rugs under its insurance contracts. Such contributions were limited to the stipulated values in the policies, and if the assessment were in excess of these amounts the defendants would be obliged to pay it.

After the loss plaintiff agreed to guarantee all general average assessments and defendants undertook to reimburse it for all sums paid out in excess of the amount of the policies. Thereafter, on September 22, 1942 defendants deposited with plaintiff $4,000 to be used for such reimbursement if necessary. Plaintiff voluntarily undertook this guarantee.

Now, defendants seek interest on this fund deposited with plaintiff. It has been stipulated that defendants' deposit was reduced to $1,649.47 by payment on February 19, 1947 by plaintiff on defendants' account for their share of the general average assessment. Defendants ask an allowance of interest on $4,000 from September 22, 1942 to February 19, 1947 and on $1,649.47 from February 19, 1947, to date. Their argument seems to be predicated on the provisions of Rule XXIII of the York-Antwerp Rules of 1924 which state that moneys paid on account of general average shall be deposited by the trustees and interest earned, if possible. Defendants claim that plaintiff had the option of either depositing this sum with the trustees or keeping and using it. But, the parties here did not proceed under these rules; they had their own agreement and contract. Plaintiff did not agree to pay interest on the money it held; there is no evidence before me that any was earned or that the funds were used by plaintiff for its own account. I can find no obligation on plaintiff's part to pay interest until a demand was made by defendants for payment of the excess. This, it is stipulated, was on November 18, 1946, but the amount of defendants' contribution was not fixed until later.

Interest is awarded defendants at six percent per annum on $1,649.47 from February 19, 1947, the date defendants' liability was determined after the demand, to the date of entry of judgment.