**ESSO STANDARD OIL CO.**

v.

**UNITED STATES.**

**THE ESSO CHARLESTON.**

United States District Court
S. D. New York.
June 10, 1954.

Kirlin, Campbell & Keating, New York City, for libelant (Edwin S. Murphy, Raymond T. Greene, New York City, of counsel).

J. Edward Lumbard, U. S. Atty., New York City, for respondent (Benjamin H. Berman, New York City, of counsel).

MURPHY, District Judge.

This suit having been tried by the court the following are made

### Findings of Fact

1. At all times mentioned herein libelant was a corporation organized under the laws of Delaware with its principal place of business within this district, and was owner of the American Steamship Esso Charleston.

2. At all such times respondent, through the War Shipping Administration, employed and operated The Esso Charleston under a requisition time charter, dated as of April 20, 1942, under which the charterer undertook to "provide and pay for or assume" insurance of "the full form of standard hull war risk policy of the War Shipping Administration which shall include malicious damages, sabotage, strikes, riots and civil commotion, * * *."

3. In accordance with said charter, War Risks Binder No. R. C. 755, dated September 9, 1942, was executed on behalf of respondent insuring the hull of The Esso Charleston against war risks only, subject by endorsement to "rules, regulations, conditions and policy forms as prescribed by the War Shipping Administration in force at the time of issuance of the binder * * *." The full form of such war risk insurance policy in force at such time contained a war risk clause providing in part:

"It is agreed that this insurance covers only those risks which would be covered by the attached policy (including the Collision Clause) in the absence of the F. C. & S. warranty contained therein but which are excluded by that warranty.

"This insurance is also subject, however, to the following warranties and additional clauses:

"The Adventures and Perils Clause shall be construed as including the risks of piracy, civil war, revolution, rebellion or insurrection, or civil strife arising therefrom, floating and/or stationary mines and/or torpedoes whether derelict or not, and/or military or naval aircraft and/or other engines of war including missiles from the land, and warlike operations and the enforcement of sanctions by members of the League of Nations, whether before or after declaration of war and whether by a belligerent or otherwise; but excluding arrest, restraint, or detainment under customs or quarantine regulations, and similar arrests, restraints, or detainments not arising from actual or impending hostilities or sanctions."

4. On the afternoon of December 31, 1942, The Esso Charleston, after a voyage in convoy from New York with cargo of admiralty fuel oil for use of Allied Expeditionary Forces in North Africa, came in contact and collided with another vessel of the same convoy, The West Madaket, loaded with cargo for use of the same forces, off Casablanca, Morocco, both vessels sustaining damage.

5. In this court both a libel (Docket No. A. 126–378) by the Waterman Steamship Corporation, owner of The West Madaket, to which answer was interposed and cross-libel (Docket No. A. 127–137) by the Standard Oil Company of New Jersey, were filed claiming damage as a result of the collision. The respondent herein was not a party to these suits in which the twelve depositions taken by both sides constitute evidence in this case by stipulation of respondent. These suits were settled on the basis of mutual fault, Standard Oil Company of New Jersey agreeing to pay 60 per cent of provable damage with interest and Waterman Steamship Corporation 40 per cent with interest.

6. The collision took place when both The Esso Charleston and The West Madaket proceeded to enter the harbor of Casablanca through an opening some two hundred feet wide in an anti-submarine net maintained and regulated by the United States Navy through orders issued to incoming and outgoing vessels. The starboard side of The Esso Charleston came in contact with the port side of The West Madaket in the vicinity of the net opening, after the latter vessel overtook the former one. Prior to the collision The West Madaket had sounded four short blasts and The Esso Charleston had turned hard left. After the collision, The West Madaket continued through the net and The Esso Charleston reversed, turned about and went back to sea to anchor.

7. The proximate cause of the collision and resulting damage was navigational fault on the part of both vessels.

8. The "consequences of hostilities or warlike operations" was not the proximate cause of the collision.

### Discussion

Two questions are presented: (I) Was the proximate cause of the collision "consequences of hostilities or warlike operations"; and (II) Did the policy issued to libelant cover damage or liability arising out of the collision between The Esso Charleston and The West Madaket.

### I.

Two further issues must be resolved in connection with the matter of proximate cause: (a) What constitutes "hostilities or warlike operations"; and (b) Whether the collision was a "consequence" of such operation, or, in the language of insurance cases, whether such operation was the proximate cause of the collision. Obviously an affirmative answer is necessary for both if libelant is to prevail.

Both vessels were carrying cargoes for use by military forces, had been in convoy and at the time of collision were proceeding through an opening in an anti-submarine net pursuant to naval orders. It would be obtuse to insist that the operation in question had no more connection with hostilities or war than two yachts drifting together in a narrow channel in some serene bay off a peacetime Côte d 'Azur. It would be equally blind to characterize the operation as no different in warlike nature than that of naval craft actually sweeping mines.[1]

Whatever the precise meaning of the oft-used phrase "hostilities and warlike operations", the cases defining it have long since made clear that merely a causal connection between a state of war and the movement of a cargo vessel is not sufficient to consider such risk within its language. We are told that " 'hostilities' is intended to describe an actual operation, offensive or defensive, in the conduct of war, and 'warlike operations' as operations in time of war. The peril must be due directly to some hostile action, if it be considered a warlike risk."[2] Clearly, it is not enough that the event have as one of its charac-

1. Standard Oil Company of New Jersey v. United States, 2 Cir., 178 F.2d 488, affirmed, 340 U.S. 54, 71 S.Ct. 135, 95 L.Ed. 68.

2. Queen Insurance Co. v. Globe & Rutgers Fire Co., 2 Cir., 282 F. 976, at page 979, affirmed, 263 U.S. 487, 44 S.Ct. 175, 68 L.Ed. 402.

teristics a "warlike" nature; in addition, that warlike quality must be a primary or principal characteristic of the operation. It is seriously questioned in the instant case whether the belligerent characteristic predominates. It would appear more likely, from the viewpoint of the collision, that the navigational aspect and not the martial one is dominant.

Assuming, however, *arguendo* that the operations were "warlike", it is clear as a question of fact that the collision was not a "consequence" of such "hostilities" in the sense that such "warlike operations" were its proximate cause. The John Worthington[3] was a case stronger on its facts than the instant one since in the collision between that tanker and a minesweeper, it was conceded that the minesweeper was engaged at the time in "warlike operations", *viz.*, sweeping mines, something that has not been found in the instant case. Nevertheless, the appellate court reversed the trial judge's conclusion that such warlike operation was the proximate cause, and the Supreme Court refused on review to disturb this resolution of a question of fact. Far from any factual distinction compelling a different result, the instant situation presents an *a fortiori* case.

## II.

■ The second question is raised by the circumstance that the words in parentheses, "including the Collision Clause" appears in the first paragraph of the clause describing the risks covered by the insurance policy under consideration. Generally, a marine policy covers common perils of the sea and contains an "F. C. & S. Clause" ("Free from Capture and Seizure") which eliminates from coverage certain stated risks of a warlike nature, including the one involved in this case, "all consequences of hostilities or warlike operations." The excepted risks may be insured against by purchase of coverage from another underwriter— such as the government, in the instant case—who insures the perils excluded by the "F. C. & S. Clause." The problem under discussion arises from the enigmatic presence of the words "including the Collision Clause" in this paragraph which reads:

"It is agreed that this insurance covers only those risks which would be covered by the attached policy (including the Collision Clause) in the absence of the F. C. & S. warranty contained therein but which are excluded by that warranty."

The alternative possible significance of the "Collision Clause" phrase is that it includes (a) *any* non-war risk collision covered by such collision clause in a marine policy; or (b) only collisions proximately caused by warlike operations; or (c) only collisions caused by warlike operations, even though not proximately caused; or finally (d) nothing at all, and the clause is pure surplusage. In The John Worthington,[4] under identically worded insurance coverage, the problem commanded the explicit attention only of the trial judge and a dissenting justice in the Supreme Court.[5] Although not explicitly discussed in the prevailing opinions, it was raised and briefed by counsel.[6] At least inferentially, the language of the Circuit Court tends to exclude alternative (a),[7] and the findings of fact in the instant case have similar effect with respect to alternatives (b) and (c), supra. In passing I reject the likelihood of alternative (d), supra. Under these circumstances, I believe this,

3. Standard Oil Company of New Jersey v. United States, D.C.S.D.N.Y., 81 F. Supp. 183, reversed, 2 Cir., 178 F.2d 488, affirmed, 340 U.S. 54, 71 S.Ct. 135, 95 L.Ed. 68.

4. Ibid.

5. 81 F.Supp. at pages 192–193; 340 U.S. at pages 68–69, 71 S.Ct. at pages 142–143.

6. Standard Oil Company of New Jersey v. United States, 2 Cir., 178 F.2d 488, Appellee's brief, pp. 5, 23–25, Appellant's reply brief, p. 9–10; 340 U.S. 54, 71 S. Ct. 135, 95 L.Ed. 68, Petitioner's brief, p. 50–56, Brief for the United States, p. 37–49.

7. Id., 178 F.2d at page 493.

second question has been resolved against libelant by the decision in The John Worthington.

### Conclusions of Law.

(1) This court has jurisdiction of the subject matter and parties.

(2) The collision and resulting damage and liability was not covered by the insurance policy issued by respondent to libelant.

(3) The libel should accordingly be dismissed.