INTERNATIONAL DAIRY ENGINEER-
ING CO. OF ASIA, INC. and Foremost
Dairies Vietnam, S.A.R.L., Plaintiffs,

v.

AMERICAN HOME ASSURANCE COM-
PANY, Defendant.

No. 48979.

United States District Court,
N. D. California.

June 23, 1970.

Harlow Rothert, Thos. F. Wolfe, and J. Robert Notz, Jr., Cushing, Cullinan, Hancock & Rothert, San Francisco, Cal., for plaintiff.

W. Martin Tellegen and Garry Morrison, Hall, Henry, Oliver & McReavy, San Francisco, Cal., for defendant.

## MEMORANDUM OF DECISION

SWEIGERT, District Judge.

This case has been submitted for decision after trial before the court without a jury.

Plaintiff, operator of a milk processing plant near Thu Duc Village, about five miles east of Saigon, South Viet Nam, held defendant's policy of Marine Insurance providing, not only standard marine transit coverage, but also land coverage including fire loss of insured's property while in plaintiff's warehouses or processing plants.

At about 1:30 A.M. on May 26, 1967, the insurance being then in full force and effect, a large stock of box material stored directly adjacent to the processing plant, was destroyed by a fire caused by the landing of an aerial parachute flare dropped by an unidentified airplane.

Defendant denies liability for the loss solely upon the ground [1] that such a loss is excluded from coverage by the standard war risk exclusion clause, Paragraph 6A of the policy providing as follows:

"Notwithstanding anything contained to the contrary, this insurance is . . . warranted free from the consequences of hostilities or warlike operations (whether there be a declaration of war or not), but this warranty shall not exclude . . . fire . . . unless caused directly . . . by a hostile act by or against a belligerent power . . .

Further warranted free from the consequences of civil war, revolution, rebellion, insurrection, or civil strife arising therefrom, or piracy."

Plaintiff contends that defendant, who has the burden of proof so far as exclusion is concerned, (United States v. Standard Oil N.J., 178 F.2d 488 (2d Cir. 1949) affirmed 340 U.S. 54, 71 S.Ct. 135, 95 L.Ed. 68; Southwestern Corp. v. Motors Ins. Co., 58 Cal.2d 91, 28 Cal.Rptr. 161, 378 P.2d 361 (1969)), has failed to prove that the fire loss here involved was "caused directly by a hostile act by or against a belligerent power" within the meaning of the policy *or* that it was the consequence of civil war, revolution, rebellion or civil strife within the meaning of the policy.

■■ Although it is true that exclusionary clauses should be strictly construed, this does not mean that they should be rendered ineffective even when their purpose is clear. It must be borne in mind that this standard war risk exclusion clause, used in marine insurance policies, reflects the general recognition that war creates perils vastly greater than and quite different from ordinary marine risks and that such risks are expected to be covered by separate war risk insurance which has a premium schedule commensurate with the greater risks. See 2 Arnould, Marine Insurance, Par. 817 (1961).

There is no dispute about the fact that at the time of the fire and in its vicinity hostilities and warlike operations were in progress between the belligerents in the Viet Nam war.

According to the evidence, airplanes of the United States, operating under the direction of Tan Son Nhut air base, located adjacent to Saigon, were airborne every night with flares ready to respond to requests for flare drops;

1. It has been stipulated by the parties that the goods were located "in a warehouse or processing plant" within the meaning of the policy; also that the goods entered into the production of products handled or manufactured by the policy within the meaning of the policy; also that the goods had a value of $88,000. The only issue remaining for decision is whether the destruction by fire of the goods is excluded by the policy's war risk exclusion clause from what otherwise would be coverage under the policy.

these flares were used for a number of purposes: (1) to illuminate downed aircraft so that covering rescue aircraft might detect and deter or destroy enemy forces attacking survivors; (2) to illuminate the Tan Son Nhut air base runways when runway lights failed due to power failure or malfunction; (3) to illuminate actual combat areas in order to permit ground forces and covering aircraft to detect and destroy enemy forces; (4) to illuminate other areas for the purpose of detecting and destroying infiltrators. Ninety per cent (90%) of the flare drops around Tan Son Nhut were dropped as a deterrent to possible infiltration or attack by the Viet Cong.

Without attempting to set forth all the details, the evidence preponderates to prove circumstances supporting the reasonable inference and our finding that the flares in question were dropped, probably in the area northeast of Tan Son Nhut air base, either in connection with a combat operation against enemy forces or in connection with operations to detect and to discourage or destroy infiltrators and that in either case these flares, still burning, drifted over plaintiff's processing plant and started the fire.

■ The term "hostilities" and "hostile act," as used in this standard exclusion clause has been defined as actual operations of war, either offensive, defensive or protective by a belligerent. See, Queen Ins. Co. v. Globe, 282 F. 976, 979 (2d Cir. 1922); Britain SS v. The King, 1 AC (HL 1920), 15 Aspinall's 58; Atlantic Ins. Co. v. King, 14 Aspinall's 430 (1908); Britain Co. v. King, 15 Aspinall's, 58, 69.

■ It has also been held that the hostile act need not involve the overt use of a weapon which is in itself, capable of inflicting harm; it can be an operation such as the extinguishment of a navigational light or the outfitting of a ship—if done for a hostile purpose.

City of Mexico, 28 F. 148, 152 (D.C.Fla. 1886); Ionides v. Universal Marine, 14 CB (NS) 258 (1863).

■ Although flares are not themselves weapons designed to destroy or harm, all of the purposes for which flares were being used in Viet Nam (with the possible exception of use merely to illuminate an air strip whose runway lights malfunctioned) would be "hostile acts" by a belligerent in the sense that all those purposes involved use of flares in conjunction with weapons capable of firepower and to expose enemy forces to that firepower.

The question remains whether the fire here involved can be said to have been "directly caused" by the hostile act within the meaning of the exclusion clause.

Plaintiff contends that, assuming the dropping of the flare to have been a "hostile act" within the meaning of the policy, such hostile act was not the direct cause of the loss, arguing that, if the flare was intended to illuminate the perimeter area of the Tan Son Nhut air base, but drifted to land, still burning, on plaintiff's plant, the direct cause of the loss would be, not the dropping of the flare, but negligence on the part of the pilot who dropped it—failure to allow for wind, drift and altitude to assure that the flare would illuminate the intended area, not the area of plaintiff's plant, or that at least the flares burning time would expire before landing.

Plaintiff cites authorities which have held that for a loss to be the consequence of hostilities and, therefore, included in war risk insurance (or excluded from coverage by a war risk exclusion) the hostilities must be the dominant and effective cause of the loss; that under certain circumstances the dominant, effective, proximate cause of a loss may be found to lie in some ordinary risk, e.g., negligence of one or both the parties, notwithstanding the existence of hostilities and warlike operations.[2]

2. Queen Ins. Co. v. Globe, 282 F. 976 (2d Cir. 1922), aff'd 263 U.S. 487, 44 S.Ct. 175, 68 L.Ed. 402; Esso v. United States, 122 F.Supp. 109 (S.D.N.Y.1954); both

None of these cases involved the actual performance of a "hostile act." All of them were cases in which ordinary maritime risks were merely increased by, but not created by war operations—a distinction well made in United States v. Standard Oil Co. N.J., *supra*, 178 F.2d p. 493; see also, The Petersham, 15 Aspinalls, 58, 69.

In our pending case the dropping of the flare was itself, a hostile act by one belligerent against another and was clearly the dominant, effective, proximate, direct cause of the loss regardless of whether that hostile act was negligently performed.

We do not consider that United States v. Standard Oil Co. N.J., 340 U.S. 54, 71 S.Ct. 135, 95 L.Ed. 68 (1950) (affirming 178 F.2d 488), heavily relied upon by plaintiff, supports plaintiff's contention that such a hostile act ceases to be the dominant, effective, proximate and direct cause of loss merely because, as contended by plaintiffs, the flare drifted from its intended course due to negligence of the pilot or otherwise.

In that case the Supreme Court merely held that a government war risk policy, insuring a ship against consequences of hostilities or warlike operations, did not as a *matter of law* cover a loss resulting from a collision between an insured merchantman and a navy mine sweeper, admittedly engaged in a "warlike operation," where both vessels were at fault, pointing out that the hostilities or the warlike operation must be the *proximate cause* of the collision, a matter depending on the resolution of *factual questions*.

In his dissenting opinion Justice Frankfurter stated that "a warlike operation does not lose its warlike character because it is carried out negligently." (p. 141) [3]

An argument to the contrary was rejected in Sloomvaart v. Merchants Marine Ins. Co., 89 LJKB 834 (HL 1919) Aspinall's 497, where a Dutch vessel had been sunk by hitting three mines which had lost their moorings and had drifted thirty miles into a non-combat zone. Lord Birkinhead referred to "the absurdity of contending that, if a torpedo which was launched by a vessel destroyed the vessel at which it was launched, that it would be the result of hostilities, but if it missed that vessel and a few moments later struck another vessel and sank it, that would not be the result of hostilities. I cannot take that view . . . ."

The question remains whether the loss in question was a consequence of "civil war, revolution, rebellion, insurrection, or civil strife arising therefrom" within the meaning of the policy.

Judicial notice may be taken of the fact that the National Liberation Front

---

involving collisions between vessels traveling in a wartime convoy; Standard Oil v. St. Paul F. & M. Ins. Co., 59 F.Supp. 470 (S.D.N.Y.1945) (vessel striking an underwater rock while traveling in a mine field); Libby v. United States, 87 F. Supp. 866 (Ct.Claims 1950) (stranding while navigating a narrow passage); United States v. Standard Oil N. J., 178 F.2d 488 (2d Cir. 1942), aff'd 340 U.S. 54, 71 S.Ct. 135, 95 L.Ed. 68 (collision between a U.S. Navy minesweeper and a merchant vessel while in the approaches to New York harbor).

3. We cite this statement from the dissenting opinion because it is not at variance with the majority opinion; we also cite the *Sloomvaart* case, infra, an English case, because, in our opinion, it is not at variance with the American rule. This becomes clear when the Supreme Court opinion in *Standard* is read in context with the unique situation there presented. Counsel for the merchantman in Standard had contended that the mere showing of loss from collision with the moving warship established liability under the policy as a matter of law, arguing that such was the English rule which the American courts should follow. The Supreme Court, rejecting this contention, nevertheless affirmed the Court of Appeal finding that the merchantman had met the burden of proving that the warlike operation had been in fact the proximate predominant and determining cause of the loss even though the District Court had found that such burden had not been met. The Supreme Court noted, however, that the so-called "matter of law" doctrine was neither unanimously nor clearly supported even by the English case.

(Viet Cong) were engaging in hostilities with the Republic of South Vietnam and as such insurgents had taken control of many regions of South Vietnam, including areas in the vicinity of the fire here in question.

The flare was obviously dropped in connection with military operations against these insurgent, rebellious Viet Cong and in our opinion the loss was a consequence of civil war, revolution, rebellion, insurrection, and civil strife arising therefrom, within the meaning of the policy. See, The Amy Warwick, 2 Black 635, 17 L.Ed. 459 (1862); Home Ins. Co. v. Davila, 212 F.2d 731, 736 (1st Cir. 1954).

For the foregoing reasons the court concludes that judgment should be rendered in favor of defendant.

This memorandum constitutes the court's findings of fact and conclusions of law for purposes of Rule 52, Federal Rules of Civil Procedure, provided, however, that either party may within ten (10) days from notice of this decision submit such additional proposed findings and conclusions under Local Rule 123(a)(c) as they deem necessary.